NO. 07-10-00277-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JANUARY 23, 2012

SCOTT'S MARINA AT LAKE GRAPEVINE LTD., D/B/A
SILVER LAKE MARINA, JUST FOR FUN OF NORTH
TEXAS, INC. AND SILVER LAKE MARINA STORE, INC.,
APPELLANTS

v.

ALLEN JOHNATHAN BROWN, APPELLEE

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY;

NO. 342-213092-05; HONORABLE BOB MCGRATH, JUDGE

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**OPINION**

Appellants, Scott's Marina at Lake Grapevine, Ltd. d/b/a Silverlake Marina (Scott's Marina), Just for Fun of North Texas, Inc. (JFF), and Silver Lake Marina Store, Inc. (the Store), appeal a judgment entered in favor of appellee, Allen Johnathan Brown, that awarded Brown $676,300 for past and future actual damages, $10,667.80 for court costs, and post-judgment interest at a rate of five percent per annum.  We affirm.

Background

Because the issues presented by appellants primarily challenge the sufficiency of the evidence, we will limit the background to a general overview of the factual background and procedural history of the case. We will discuss the evidence more fully in the analysis of each of appellants' issues below.

Brown was employed to work weekends at the Store during the summer of 2005. The Store was owned by Scott's Marina, but had been leased to JFF. Brown was hired by JFF and was paid by JFF.

On June 11, 2005, Brown was working the cash register at the Store when he heard a "whoosh-type" noise and was immediately struck by a "godawful smell." A substance began to backup and overflow out of the hub drain[1] of a Pepsi soda fountain machine in the Store. The Store was initially evacuated before Brown was ordered to clean up the backflowed substance. Brown performed the cleanup with the use of a mop and bucket. No additional protective wear was provided to Brown while he cleaned up the backflow. Additional spills occurred over the remainder of the weekend of the 11th. It took Brown about ten to fifteen minutes to clean the spillages each time they occurred.

The following weekend, the hub drain again backflowed on multiple occasions. On these instances, two other Store employees assisted Brown in clean up of the spillages. Plumbers were called to the Store on June 20, and apparently installed

---

[1] The hub drain of a soda fountain machine is the receptacle at the bottom of the machine that is designed to catch spillage from the machine.

backflow valves to the hub drain line. Regardless, no further backflows occurred after June 19.

During the second weekend, Brown developed a cough and a sore throat. He indicated that the glands in his neck started to swell. Nonetheless, Brown attempted to work through his developing illness. However, due to severe vomiting and diarrhea, Brown eventually had to seek medical attention on July 5. Brown's illness worsened from July 5 to July 11, when Brown had his mother take him to the emergency room because he was vomiting uncontrollably. Brown was hospitalized and diagnosed with enteroviral meningitis and Lemierre's Syndrome. To prevent the spread of these conditions, doctors tied off one of Brown's jugular viens. Brown spent twelve days in the hospital due to this illness. After his release from the hospital, Brown continued to have medical and emotional problems that restricted his everyday life.

Brown filed suit against the appellants contending that the spillage that he was required to clean up in the Store on the weekends of June 11th and 18th of 2005 was sewage containing human feces, and that this exposure to human feces caused Brown's acute and continuing illnesses. At the trial, Brown offered the expert testimony of Itzhak Brook on the issue of causation. Brook, a leading expert in the field of anaerobic infectious disease, opined that, in reasonable medical probability, Brown's exposure to sewage containing human feces at the Store was the proximate cause of his enteroviral meningitis and Lemierre's Syndrome. At the close of evidence, the case was submitted to the jury who returned a verdict in favor of Brown. Specifically, the jury found that appellants were negligent; that Scott's Marina was 60 percent responsible,

JFF was 20 percent responsible, and the Store was 20 percent responsible; and awarded Brown damages of $250,000 for past physical pain and mental anguish, $75,000 for future physical pain and mental anguish, $89,000 for past lost earning capacity, $102,300 for future lost earning capacity, $60,000 for past medical expenses, and $100,000 for future medical expenses. Appellants filed a motion for entry of judgment notwithstanding the verdict, which was denied by the trial court. The trial court entered judgment on the jury's verdict, and appellants appealed this judgment.

Scott's Marina filed a brief on its own behalf and JFF and the Store filed a joint brief on their behalf. The issues presented by Scott's Marina are (1) the trial court abused its discretion in admitting Brook's unreliable testimony, (2) the evidence was insufficient to establish that Brown was exposed to sewage at the Store, and (3) the jury's award of actual damages cannot be sustained. The issues presented by JFF and the Store are (1) the trial court erred in admitting Brook's testimony over appellants' objection, (2) the evidence is insufficient to support the jury's implied finding that Brown was exposed to human waste, and (3) the evidence is insufficient to support the jury's implied finding that appellants should have foreseen the risk that Brown could be exposed to human waste. We will address appellants' issues in a slightly different order starting with the issue of whether the evidence was sufficient to establish that Brown was exposed to human waste.

Sufficiency of the Evidence – Exposure to Human Feces

By both of their second issues, appellants contend that the evidence was insufficient to support the jury's implied finding that Brown was exposed to sewage

4

containing human feces by cleaning up the backflowed spillage in the Store on the weekends of June 11 and 18 of 2005. The significance of this implied finding is that Brook's expert causation testimony assumes that Brown was exposed to human feces containing enterovirus, and that this exposure led to Brown's subsequent medical problems. Additionally, JFF and the Store contend, by their third issue, that the evidence was insufficient to support the foreseeability of human feces backflowing into the Store.

Standard of Review

When a party challenges the legal sufficiency of the evidence supporting a jury finding, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports it. See City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. Id. at 827. If the evidence would permit reasonable and fair-minded people to reach the finding under review, the legal sufficiency challenge fails. Id.

When a party challenges the factual sufficiency of the evidence, we consider all of the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). In conducting our review, we are mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. City of Keller, 168 S.W.3d at 819; Hinkle v. Hinkle, 223 S.W.3d 773, 782 (Tex.App.—Dallas 2007, no pet.).

5

Analysis

Appellants contend that the overwhelming weight of the evidence proves that the configuration of the plumbing was such that it would not have been possible for wastewater or sewage containing human waste to have backflowed into the Store on the occasions in issue. Due to the configuration of the plumbing, appellants argue that the evidence conclusively establishes that the substance that backflowed into the Store came from the burger dock sink and, therefore, did not contain feces.

Appellants contend that the evidence conclusively established that the drain line from the Store was not directly connected to a sewage line that was used to evacuate the sewage from boats. Brown contends that there was significant conflict in the evidence that would allow the jury to reasonably conclude that appellants altered the configuration of the drainage system between the time of the spillages in question and subsequent inspections of that drainage system. In fact, at the conclusion of the hearing on appellants' motion for judgment notwithstanding the verdict, the trial court stated, "The findings of the jury can only be understood if you believe the defendants changed the configuration of the pipes after the incidents, and then came to court and lied about it. There is testimony to support this. There's no evidence to refute it." Further, it is undisputed that the hub drain line was connected to the gray water burger dock line and that backflow prevention devices were not installed on these lines. While we conclude that there is some evidence that would "refute" the theory that appellants altered the configuration of the drainage system and then lied about it, we agree with the trial court that there is some evidence to support this conclusion. As such, we must

6

defer to the jury's reasonable resolution of this conflict in the evidence. See City of Keller, 168 S.W.3d at 819. Thus, we conclude that the evidence was sufficient to establish that the pump-out sewage line was connected to the hub drain line.

However, concluding that the pump-out sewage line was connected to the hub drain line is not sufficient to establish that the spillage was sewage containing human feces. Appellants contend that the configuration of the pump-out sewage system was such that, at the time of the spillage, it would have been impossible for sewage from the pump-out sewage line to have backflowed into the Store. According to appellants, this is because the two pump-outs operated in conjunction with one another based on vacuum suction at the time of the spillage and the multiple openings in the hub drain line and gray water burger dock line would have prevented the pump-outs from being able to push the sewage up through the hub drain line. Brown's ultimate theory is that appellants installed a second motor on the pump-out sewage line in the Spring of 2005 that allowed the pump-out lines to operate independently of one another, and that this motor provided the force sufficient to push the sewage through the hub drain line.

The evidence relating to whether the pump-outs operated independently or in conjunction at the time of the backflow is in sharp conflict. Evidence that supports the determination that the pump-outs were working independently and on their own motors in June of 2005 was presented through the testimony of Rulene Reynolds, manager of Silver Lake Marina at the time of the incidents, J.B. Strohkirch, maintenance man for the marina, and Tom Sanford, superintendent for the marina. However, each of these witnesses also provided testimony that, at the time of the incidents, the pump-out lines

were working in conjunction with one another, with only one motor, based on vacuum suction.[2] Because this testimony is internally inconsistent, we must defer to the jury's determination of which version of events was credible. See id.; Hinkle, 223 S.W.3d at 782. The jury's resolution of this conflict is especially entitled to deference in light of the evidence addressed above that would allow a reasonable determination that appellants altered the configuration of the plumbing and "then came to court and lied about it."

Further bolstering the jury's determination that the pump-outs pushed sewage into the Store is the testimony providing that the pump-outs could only operate using vacuum suction if they were not connected to the hub drain line. In other words, the evidence established that it would not be possible for the pump-outs to be connected to the hub drain line and still operate in conjunction, using only a single motor, because the openings at the end of the hub drain line would have prevented the creation of a vacuum. However, if the pump-outs operated independently, with each having their own motor, the pump-outs would have been able to operate even if connected to the hub drain line. In fact, according to Mark Jensen, appellants' engineering expert, the motor would allow the waste from the pump-outs to be pushed through the hub drain line causing the backflow of waste containing human feces into the Store.

In addition, a review of the entire record reveals that there was significant disagreement among the eyewitnesses about the characteristics of the substance that backflowed into the Store. Some of the witnesses testified that the substance was clear

---

[2] Both Strohkirch and Sanford testified that a second motor was installed in March of 2005 in their pre-trial depositions. However, at trial, each changed their testimony to indicate that the second motor was installed in the Fall of 2005.

and smelled like rotten food and grease. Other eyewitnesses testified that the substance was dirty and that it smelled like sewage. Obviously, this testimony creates a conflict in the evidence regarding the characteristics of the substance that backflowed into the Store. The jury clearly resolved this conflict by determining that the substance that backflowed into the Store was sewage containing human feces. Because there is evidence to support the jury's implied finding that the substance that backflowed into the Store contained human feces, we must conclude that there was legally and factually sufficient evidence to support this implied finding. See Walker & Assocs. Surveying, Inc. v. Austin, 301 S.W.3d 909, 916-17 (Tex.App.—Texarkana 2009, no pet.).

As the evidence is sufficient for the jury to have concluded that the substance that backflowed into the Store was sewage containing human feces, regardless of JFF and the Store's knowledge of the configuration of the plumbing, it was foreseeable that making an employee clean up sewage containing human feces by use of a mop and bucket could expose the employee to viruses contained within the human feces. The combined effect of the evidence that allows for a reasonable inference that JFF and the Store were aware of the plumbing's configuration together with JFF and the Store requiring Brown to clean up a backflowed spillage that the jury could reasonably find to have been sewage containing human feces is enough to establish that Brown's exposure to human feces was foreseeable.

Consequently, we overrule appellants' second issues and conclude that the evidence was sufficient to support the jury's implied finding that the substance that backflowed into the Store was sewage containing human feces. Likewise, due to the

9

the evidence allowing the jury to reasonably conclude that JFF and the Store were aware of the plumbing's configuration and that Brown was required to clean up human feces by JFF and the Store, the evidence is sufficient to support the jury's implied finding that Brown's injury was foreseeable. As such, we also overrule JFF and the Store's third issue.

## Admissibility of Expert Causation Testimony

By their first issues, appellants contend that the trial court erred in admitting the expert medical testimony on causation of Dr. Brook over appellants' objections that the testimony was unreliable. While their issue is presented in terms of admissibility, a review of the arguments of appellants reveal that appellants are actually contending that the evidence is insufficient to establish the reliability of Brook's expert testimony on causation. As such, our analysis of the sufficiency of the evidence supporting the reliability of Brook's testimony will determine our assessment of the admissibility of Brook's testimony. See Merrill Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1996) (evidence must be scientifically reliable to constitute "some evidence" to support judgment).

### Standard of Review

For expert testimony to be admissible, the expert must be qualified, the testimony must be relevant to the issues in the case, and the testimony must be based on a reliable foundation. TXI Transp. Co. v. Hughes, 306 S.W.3d 230, 234 (Tex. 2010); Gross v. Burt, 149 S.W.3d 213, 237 (Tex.App.—Fort Worth 2004, pet. denied). Even when expert testimony is admitted by the trial court, a party may complain on appeal

that the expert testimony is legally insufficient to support the judgment because it is unreliable so long as that party objected to the reliability of the evidence before or during trial.[3] Maritime Overseas Corp., 971 S.W.2d at 409; Gross, 149 S.W.3d at 237. Unreliable expert testimony is not relevant evidence and, therefore, constitutes no evidence. See TXI Transp. Co., 306 S.W.3d at 234; Gross, 149 S.W.3d at 237.

In determining whether expert testimony is reliable, a reviewing court must employ "an almost *de novo*-like review and, like the trial court, look beyond the expert's bare testimony to determine the reliability of the theory underlying it. Gross, 149 S.W.3d at 237 (quoting Austin v. Kerr-McGee Refining Corp., 25 S.W.3d 280, 285 (Tex.App.—Texarkana 2000, no pet.)). "An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts." Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999). In assessing the admissibility of expert testimony, we do not focus on the correctness of the expert's opinion, but on the reliability of the analysis the expert used in reaching his or her conclusions. Gross, 149 S.W.3d at 237.

---

[3] We acknowledge that Brown contends that appellants waived their issue regarding the reliability of Brook's expert testimony. However, when the video of Brook's deposition testimony was offered at trial, the appellants timely objected to this evidence "based on the hearing that we've had outside the presence of the jury with regard to Daubert and those matters." The trial court overruled the objection and the videotaped deposition was shown to the jury. As such, appellants' objection to the admission of Brook's testimony at trial simply re-urged their objections made pretrial, and were sufficient to preserve error. See TEX. R. APP. P. 33.1.

Further, appellants can challenge the sufficiency of the evidence supporting the reliability of Brook's testimony so long as they objected to the reliability of the evidence before trial or when it is offered at trial. See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998). Appellants, in the present case, objected to the reliability of Brook's testimony both before trial and when offered at trial.

11

The Texas Supreme Court has articulated six nonexclusive factors appellate courts should consider in determining whether scientific testimony is reliable:

> (1)    The extent to which the theory has been or can be tested;
> (2)    The extent to which the technique relies upon subjective interpretation of the expert;
> (3)    Whether the theory has been subjected to peer review and publication;
> (4)    The technique's potential rate of error;
> (5)    Whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
> (6)    The non-judicial uses that have been made of the theory or technique.

Havner 953 S.W.2d at 714. However, the approach to assessing reliability must be flexible depending on the nature of the evidence. Transcon. Ins. Co. v. Crump, 330 S.W.3d 211, 216 (Tex. 2010). One additional factor that has been held to be of particular significance is whether the expert has ruled out other likely causes within a reasonable degree of medical probability. See id. at 217-18.

Analysis

a.  The Extent to Which the Theory Has Been or Can Be Tested

Appellants' challenge of the testing of Brook's theory basically challenges the theory in two particular aspects: (1) Brook assumed that Brown was exposed to wastewater or sewage containing human feces, and (2) Brook failed to establish an accepted causal link between exposure to human feces and development of Lemierre's Syndrome.

12

As for Brook's assumption that Brown was exposed to human feces, his testimony is clear that his opinion is premised on this assumption. Thus, the weight that the jury could reasonably afford Brook's opinion was dependent on the jury's resolution of the factual issue regarding whether Brown was exposed to human feces when he cleaned up the backflowed spillage at the Store. As addressed above, there was sufficient evidence presented to allow the jury to reasonably conclude that the backflowed spillage contained human feces. However, because Brook acknowledged this assumption and because the validity of this assumption relied on the jury's determination of fact, the validity of Brook's assumption goes to the weight to be ascribed to the evidence rather than to its admissibility. See LMC Complete Auto., Inc. v. Burke, 229 S.W.3d 469, 478 (Tex.App.—Houston [1st Dist.] 2007, pet. denied) ("The weakness of facts in support of an expert's opinion generally goes to the weight of the testimony rather than the admissibility.").

As for the causal connection between exposure to human feces and Lemierre's Syndrome, we believe that there was sufficient evidence presented during the pre-trial hearing to establish that a causal chain between exposure to human feces and Lemierre's Syndrome is accepted. Dr. Louis Marshall Sloan, appellants' expert witness, testified in his deposition that the primary cause of enteroviral infection is exposure to fecal matter. Sloan also acknowledged the textbook, PRINCIPLES AND PRACTICE OF INFECTIOUS DISEASES, to be commonly relied upon as authoritative by infectious disease specialists. Portions of this textbook offered by Brown in his pre-trial evidence identifies that wastewater and sewage are common sources of enteroviral infections. While Sloan and Brook disagreed regarding whether the enterovirus or fusobacterium caused

13

Brown's pharyngitis that led to the Lemierre's Syndrome, Brown offered a peer reviewed article as well as citation to the authoritative textbook that Lemierre's Syndrome is an uncommon, but known, result of a viral pharyngitis. After reviewing all of the evidence that was offered to establish that Brown's exposure to human feces caused his enteroviral infection which led to his Lemierre's Syndrome, while certainly not conclusive, we believe that there is some medical acceptance of a causal connection between exposure to human feces and Lemierre's Syndrome that is sufficient to establish the reliability of Brook's theory.

b. The Extent to Which the Theory Has Been Subjected to Peer Review and Publication

Appellants next challenge the lack of peer review or publication of Brook's theory. Essentially, appellants complain that Brook did not prove that Brown was exposed to human feces that contained enterovirus, and that he did not cite any published support for a scientifically significant link between enteroviral and/or fuseobacteria exposure and the types of illnesses which Brown suffered.

As addressed above, Brook premised his testimony on the clearly stated assumption that Brown was exposed to sewage containing human feces when Brown cleaned up the backflowed spillage in the Store. Both Brook and Sloan as well as much of the published medical articles that were submitted by Brown acknowledge that enterovirus can be found in human feces, and that the most common form of transmission of enteroviral infections is oral-fecal transmission.

As to the claimed lack of published support for a link between enteroviral infection and Brown's medical issues, the published articles appear to support Brook's explanation of the link between the enteroviral infection causing the pharyngitis, which then created the conditions necessary for Brown to develop Lemierre's Syndrome. Sloan opined that Brown's Lemierre's Syndrome was caused by fusobacterium alone. However, fusobacterium is a natural bacteria that is in the mouths of all humans. This fusobacterium is prevented from causing infections by the body's natural immune system. According to Brook and the medical articles offered by Brown, when a virus weakens a person's immune system, it can create conditions where the fusobactrium can be released and can cause pharyngitis. Thus, while the experts disagree regarding whether the enterovirus or the fusobacterium caused Brown to develop the pharyngitis that became Lemierre's Syndrome, there is published support for a scientifically significant link between Brown's exposure to human feces and his development of Lemierre's Syndrome.

c. The Extent to Which Other Likely Causes Were Ruled Out

Appellants next contend that Brook's expert testimony on causation was unreliable because he failed to rule out other likely causes of Brown's illness. This is an important factor in assessing the reliability of an expert's opinion testimony. See Transcon. Ins. Co., 330 S.W.3d at 217-18; Havner, 953 S.W.2d at 720.

Both experts in this case opined that the most common source of enteroviral infection is the oral introduction of human fecal matter. Brook testified that the sewage that backflowed into the Store was, within a reasonable degree of medical probability,

15

the source of Brown's enteroviral infection. Sloan testified that, if the backflowed spillage was sewage and if the incubation period matched, then it was a "higher possibility" as the source of Brown's enteroviral infection. Further, many other likely causes of enteroviral infection were considered and ruled out both by Brook as well as by the physicians that treated Brown at Baylor Regional Medical Center at Grapevine. Finally, Brown provided an affidavit that attested that he was not exposed to any of the other most common sources of enterovirus.

In the final analysis, Brook was able to rule out the most likely other causes of Brown's contracting the enteroviral infection.[4] A medical causation expert need not disprove or discredit every possible cause other than the one he espouses. Transcon. Ins. Co., 330 S.W.3d at 218. If evidence presents other plausible causes that could be negated but are not, the reliability of the testimony is undermined. See id. However, in this case, the only plausible causes that were capable of being negated were negated.

d. Incubation Period and Brown's Illness

Another challenge to Brook's reliability raised by appellants is that the period between Brown's exposure to the spillage and his development of symptoms does not correlate to the medically accepted incubation period for enterovirus. Sloan emphasized this alleged inconsistency in Brook's testimony.

---

[4] We disagree with the dissent's characterization of Brook's testimony that he was able to rule out other possible sources of Brown's contraction of enterovirus as conclusory. A number of other possible sources of Brown's exposure to enterovirus were ruled out by information Brown provided to the doctors that treated his enteroviral infection, and this information was documented in Brown's medical records which were reviewed by Brook. Further, Brown's affidavit provided additional evidence ruling out his exposure to other sources of enterovirus.

16

Sloan indicated that the normal incubation period for an enteroviral infection is three to five days with the extremes being two to twelve days.[5] Because Brown did not seek medical care until July 4, which was fifteen days after his last exposure to the backflowed spillage in the Store, Sloan concluded that the exposure could not have caused Brown's enteroviral infection. However, Brown's mother indicated to Brown's initial treating physicians that the onset of his symptoms actually occurred on or about June 20. Clearly, symptoms appearing on June 20, the day after Brown's last exposure to the spillage, would fit within the incubation period of both Brook and Sloan. Nothing in the testimony of Sloan acknowledges this June 20 onset of symptoms.

As there is evidence that supports Brown's onset of symptoms occurring on June 20, well within the incubation periods identified by both experts, we do not conclude that the delay in Brown exhibiting symptoms is evidence that Brook's expert opinion is unreliable.

Conclusion

As our review of the record reveals that the evidence was sufficient to support the reliability of Brook's expert testimony opining that Brown's exposure to human feces at the Store caused his enteroviral infection[6] which then led to Brown's other medical conditions, we overrule appellants' first issues.

---

[5] Brook's identification of the incubation period for enteroviral infection was that the typical case would become symptomatic between twelve hours to three days with the outer extreme being symptoms appearing fourteen days after exposure.

[6] The dissent focuses on the legal sufficiency of the evidence supporting whether the sewage containing human feces that backflowed into the Store contained

17

Sufficiency of the Evidence – Damages

By Scott's Marina's third issue, appellants challenge the sufficiency of the evidence to support the jury's award of actual damages to Brown.[7]  Specifically, appellants claim that the jury's award of damages was excessive.

As a general principle, we need to remain mindful that the amount of damages awarded is uniquely within the jury's discretion.  Missouri Pac. R.R. Co. v. Roberson, 25 S.W.3d 251, 257 (Tex.App.—Beaumont 2000, no pet.).  "[I]t is only when [a jury's]

enterovirus, and whether Brown's cleaning of this sewage was how Brown contracted the enteroviral infection.  While we agree with the dissent's analysis that there were ways in which Brown's evidence that the sewage contained enterovirus could have been stronger, we disagree with the dissent's conclusion that the evidence establishing the likely presence of enterovirus in the sewage containing human feces was legally insufficient.

The evidence that supports the conclusion that the sewage that backflowed into the Store contained enterovirus and that it was the source of Brown's contraction of the enteroviral infection includes: Brook's testimony that, within a reasonable degree of medical probability, the most likely source of Brown's enteroviral infection was the sewage containing human feces that backflowed into the Store; Sloan's testimony that, if Brown was exposed to human feces by cleaning up the backflowed substance and his onset of symptoms fell within the incubation period, facts which are established by sufficient evidence, then the spillage was the "higher possibility" as the source of Brook's enteroviral infection; and the recognition in the authoritative textbook, PRINCIPLES AND PRACTICE OF INFECTIOUS DISEASES, of the increased risk of enteroviral infection arising from exposure to human feces.

Likewise, as discussed in footnote 4, we conclude that there is substantial evidence ruling out other sources of enterovirus, and disagree with the dissent's characterization that other sources were ruled out solely on the basis of Brook's bare conclusion.

[7] While the issue of the sufficiency of the evidence to support the damages awarded is raised only by Scott's Marina, under the authority of Texas Rule of Appellate Procedure 9.7, JFF and the Store joined in and adopted by reference all issues and arguments advanced by Scott's Marina.  See TEX. R. APP. P. 9.7.  Thus, we will consider the issue of the sufficiency of the evidence to support the damages awarded as being asserted by all appellants.

award of damages is 'flagrantly outrageous, extravagant, and so excessive as to shock the judicial conscience,' that it may be disturbed." Id. at 257-58 (quoting Am. Bank of Waco v. Waco Airmotive, Inc., 818 S.W.2d 163, 175 (Tex.App.—Waco 1991, writ denied)).

The standard of review for a challenge contending that an award of actual damages was excessive is the same as is used in a factual sufficiency challenge. See Maritime Overseas Corp., 971 S.W.2d at 406. As stated above, when a party challenges the factual sufficiency of the evidence, we consider all of the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and manifestly unjust. Cain, 709 S.W.2d at 176. However, we must remain mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. City of Keller, 168 S.W.3d at 819; Hinkle, 223 S.W.3d at 782.

Appellants specifically challenge the following damages findings: (1) $89,000 for loss of past wages, (2) $102,300 for loss of earning capacity in the future, (3) $60,000 for medical expenses incurred before trial, (4) $100,000 for future medical expenses, (5) $250,000 for past physical pain and mental anguish, and (6) $75,000 for future physical pain and mental anguish.

Lost Earning Capacity

Appellants' first challenge to the jury's award of damages goes to the sufficiency of the evidence to support the awards for Brown's lost earning capacity. Lost wages refers to the actual loss of income due to an inability to perform a specific job from the

time of injury to the time of trial.  Koko Motel, Inc. v. Mayo, 91 S.W.3d 41, 51 (Tex.App.—Amarillo 2002, pet. denied).  On the other hand, lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury.  Id.  Both forms of lost earning capacity are measured not by what a person actually earned before an injury, but by what the person's capacity to earn was even if he had never worked in that capacity in the past.  Gen. Motors Corp. v. Burry, 203 S.W.3d 514, 553 (Tex.App.—Fort Worth 2006, pet. denied).  Because calculating the extent of impairment constitutes an exercise in uncertainty, the assessment of past capacity is left to the discretion of the jury so long as there is reasonably certain evidence to support the jury's exercise of that discretion.  Koko Motel, Inc., 91 S.W.3d at 51-52.

Looking to the evidence in support of the jury's award of $89,000 for Brown's lost earning capacity between injury and trial, the jury was presented evidence that Brown was a hard working young man that held two jobs before the injury.  The jury also heard that Brown was a fairly skilled automobile mechanic, and that he was attempting to become more skilled in this area through working at an auto repair and performance garage, where he earned approximately $10 per hour, and through pursuing an education in marketing and management in the automotive aftermarket industry.  As a side business, Brown ran an automobile repair service out of his house, charging other students $20 per hour to perform various repairs to their vehicles.  Further, the jury heard evidence that Brown was unable to maintain employment because of the frequency with which he continued to have illnesses and setbacks due to his exposure to human feces at the Store.

Thus, we conclude that the evidence was sufficient to establish that, prior to the injury, Brown had the capacity to work, at least, a 40-hour work week, and the evidence of the skills Brown possessed in automobile repair is sufficient to establish a reasonable inference that he would have had the capacity to work in the auto repair industry, and that he would have earned at least $10 per hour.  See Burry, 203 S.W.3d at 553.  Also, we conclude that the evidence was sufficient to establish that Brown's inability to work was the result of the illnesses and their effects caused by his exposure to human feces at the Store.  As a result, we conclude that, at a minimum, Brown's lost capacity to earn wages from the time of his exposure to human feces at the Store to the trial was approximately $94,000.[8]  While an offset for wages that Brown was able to earn during this time would bring the total slightly under the damages awarded by the jury, we note that our calculation of lost earnings reflects a minimum calculation of lost earnings supported by the record, and we cannot say that the jury abused its discretion by awarding Brown slightly more than the absolute minimum amount that the evidence would support.  See Koko Motel, Inc., 91 S.W.3d at 51-52.

Turning to appellants' challenge of the sufficiency of the evidence to support the jury's award of $102,300 for future lost earning capacity, the jury heard evidence that Brown was unable to hold steady employment due to the frequency with which he became ill and needed medical attention.  After repeated attempts, Brown has been unable to progress toward a college degree due to the physical and psychological effects of his exposure to human feces at the Store.  The jury also heard evidence that, because of seizures Brown began to experience after the instant incident, he is unable

---

[8] This calculation is based on a $10 per hour job working 40 hours per week.

to drive safely. Finally, the jury also heard evidence that Brown suffered from post-traumatic stress disorder and depression, and that his treating psychologist felt that Brown's chances of recovery from these issues was guarded or pessimistic.

Thus, we conclude that the evidence was sufficient to allow the jury to conclude that Brown's future earning capacity was diminished by the illnesses he developed as a result of his exposure to human feces in the Store. The jury was able to infer that Brown would have a substantial life expectancy based on his health and vitality prior to the present incident, as well as the fact that he was only 23 years old at the time of trial. See Borden, Inc. v. Guerra, 860 S.W.2d 515, 524-25 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.). We further conclude that it is reasonable for the jury to infer that Brown's earning capacity is diminished by his inability to progress toward obtaining a higher education or to maintain steady employment, and that these limitations on Brown's capacity are the direct result of his continuing illnesses and psychological problems which are the direct result of his exposure to human feces in the Store. The evidence of Brown's inability to continue to advance within the automotive repair and performance field due to his injuries and their effects support a loss of earning capacity continuing into the future and resulting from Brown's exposure to human feces at the Store. We conclude that the evidence was sufficient to allow the jury, in the exercise of its sound discretion, to determine the proper amount of damages to compensate Brown for future loss of earning capacity. See McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 712-13 (1943).

<u>Medical Expenses</u>

Turning to appellants' challenge to the sufficiency of the evidence to support the jury's award of $60,000 for Brown's past medical expenses, we note that appellants' entire argument is premised on their contention that the evidence is insufficient to establish a causal connection between Brown's exposure to human feces in the Store and his resulting illness. However, as thoroughly addressed in the issues above, we have concluded that the evidence was sufficient to allow the jury to conclude that Brown was exposed to human feces and that this exposure was the producing cause of Brown's past medical expenses. As such, we affirm the jury's award of $60,000 for medical expenses incurred by Brown in the past.[9]

Appellants also challenge the sufficiency of the evidence supporting the jury's award of $100,000 for medical expenses reasonably expected to be incurred by Brown in the future. For future medical expenses to be recoverable, the evidence must show that there is a reasonable probability that such expenses will be incurred in the future. <u>Columbia Med. Ctr. of Las Colinas v. Bush</u>, 122 S.W.3d 835, 862-63 (Tex.App.—Fort Worth 2003, pet. denied). Due to the inherently speculative nature of awards for future medical expenses, the factfinder may award future medical damages based on the nature of the injury, the medical care rendered prior to trial, and the condition of the injured party at the time of trial. <u>Ibrahim v. Young</u>, 253 S.W.3d 790, 809 (Tex.App.— Eastland 2008, pet. denied).

---

[9] We note that appellants do not challenge the sufficiency of the evidence to support the $60,000 amount of past medical expenses. As such, we may not review that issue. <u>See</u> <u>Allright, Inc. v. Pearson</u>, 735 S.W.2d 240, 240 (Tex. 1987).

23

In the present case, we conclude that the evidence is sufficient to establish a reasonable probability that Brown will sustain future medical expenses in treatment of the illnesses and effects arising from his exposure to human feces in the Store. Brook testified that the illnesses and even the treatments received by Brown would result in him having an increased susceptibility to infection, and this susceptibility has been borne out by the frequency with which Brown has had to seek medical care from the time of exposure to trial. Further, Dr. Rider, Brown's treating psychologist, testified that Brown suffers from depression and post-traumatic stress disorder due to his exposure to human feces and illnesses arising therefrom, and that Brown's prognosis is guarded or pessimistic. In addition, the jury heard evidence regarding the extent of medical treatment Brown received in the past, including significant treatments continuing years beyond Brown's exposure. Based upon the evidence supporting the serious nature of Brown's injuries, the cost and amount of medical care necessitated before trial, and the evidence of the reasonable probability that Brown will require frequent physical and psychological treatment in the future due to his exposure to human feces in the Store, we conclude that the jury's exercise of its discretion in awarding Brown $100,000 for future medical expenses is supported by sufficient evidence. See id.

Physical Pain and Mental Anguish

Finally, appellants challenge the sufficiency of the evidence to support the jury's award of damages to Brown for physical pain and mental anguish.

In addressing both the jury's award of $250,000 for past physical pain and mental anguish and $75,000 for future physical pain and mental anguish, appellants'

24

arguments are confined solely to the sufficiency of the evidence to support the jury's award for mental anguish damages. None of the appellants challenged the trial court's charge to the jury which asked for a lump sum for both physical pain and mental anguish damages. Appellants did not draw the trial court's attention to their complaint that there was insufficient evidence to support an award of mental anguish damages, separate and apart from physical pain damages, during the charge conference, in closing arguments, or in a motion for new trial. See Ake v. Monroe, No. 04-05-00751-CV, 2006 Tex.App. LEXIS 9138, at *11-12 (Tex.App.—San Antonio Oct. 25, 2006, no pet.) (mem. op.). As such, appellants are limited to challenging the sufficiency of the evidence supporting the damage award as a whole. Id. at *12 (citing Thomas v. Oldham, 895 S.W.2d 352, 359-60 (Tex. 1995), and Tagle v. Galvan, 155 S.W.3d 510, 514-16 (Tex.App.—San Antonio 2004, no pet.)). Because appellants do not argue that the evidence is insufficient to support the jury's awards for physical pain and mental anguish, we are unable to assess the sufficiency challenge asserted by appellants.[10] See id. at *13.

Conclusion

Having overruled each of appellants' issues, we affirm the judgment of the trial court.

                                                    Mackey K. Hancock
Campbell, J., dissenting.                                  Justice

_____

[10] Even were we to conclude that the evidence is insufficient to support any award of damages to Brown for past or future mental anguish, it is possible that the jury's entire awards of past and future physical pain and mental anguish damages were to compensate Brown for the physical pain he has and will suffer.