

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-13-00109-CV
_____

WEST STAR TRANSPORTATION, INC., APPELLANT

V.

CHARLES ROBISON AND CHERIE ROBISON, APPELLEES

On Appeal from the 72nd District Court
Lubbock County, Texas
Trial Court No.2009-546,118; Honorable Ruben G. Reyes, Presiding

January 23, 2015

OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, West Star Transportation, Inc., appeals the entry of a judgment in favor of Appellees, Charles and his wife, Cherie Robison, for damages totaling $5,298,590.78, for personal injuries sustained by Charles while working for West Star. By four issues, West Star contends (1) the evidence is legally and factually insufficient to support the jury's finding that West Star's negligence proximately caused the occurrence in question, (2) the trial court erred in submitting a broad-form negligence

question, (3) the evidence is legally and factually insufficient to support the jury's findings as to damages, and (4) the trial court erred in granting summary judgment as to West Star's affirmative defense of settlement and counterclaim for breach of a settlement agreement. We affirm the judgment of the trial court.

BACKGROUND

On April 23, 2007, Charles sustained a traumatic head injury after falling head first from a loaded flatbed trailer which he was attempting to cover in the shipping yard of West Star Transportation, Inc., his employer. At the time of the accident, West Star was a nonsubscriber under the Texas Workers' Compensation Act. It was undisputed that the load being covered was an uneven load, containing both uncrated equipment and pallet crates of differing heights, and was approximately thirteen feet off the ground at its highest point, which was an unusual occurrence at West Star. In fact, West Star did not even own the equipment needed to complete the task. Covering the load required that a tarpaulin, which weighed approximately 150 pounds, be placed on the highest point of the load. After the tarpaulin was removed from a West Star storage area, it was raised to the top of the load by a forklift West Star had to borrow from a neighboring business. Charles was also lifted to the top of the load by standing on the pallet being lifted. While the exact cause of the fall was undetermined, it is clear the fall occurred while Charles was standing on the surface of the load, manipulating the tarpaulin without safety equipment or assistance. As a result of the fall, Charles sustained a traumatic brain injury.

On January 29, 2009, Charles and Cherie brought this suit seeking recovery of the damages they sustained as a result of those injuries. In their original petition, the

2

Robisons alleged West Star was "negligent in failing to provide a reasonably safe place to work." By letters dated April 13, and May 5, 2009, the Robisons offered to settle their claims for the remaining limits of West Star's insurance policy. The May 5 settlement offer stated the offer would expire at 5:00 p.m., on May 8, 2009. West Star contends that one of its attorneys, Levi McCathern II, telephoned one of the Robisons' attorneys, Christopher Carver, and orally attempted to accept that settlement offer prior to the stated deadline. After the deadline passed, West Star again attempted to accept the settlement offer by faxing a signed written memorandum to the Robisons' attorneys. Because the Robisons believed the offer automatically terminated when it was not timely accepted in the manner required for a binding settlement agreement, they rejected West Star's purported acceptance. West Star then offered to settle the case on May 14, 2009. When that offer was refused, West Star amended its answer to allege the affirmative defense of settlement. West Star later filed a counterclaim against the Robisons for breach of the settlement agreement it believed to exist between the parties. The Robisons filed a no-evidence motion for summary judgment on the counterclaim on the grounds there was no meeting of the minds and the settlement offer, as presented, was not timely accepted in a manner that complied with the requirements of Rule 11 of the Texas Rules of Civil Procedure.

On February 5, 2010, the trial court denied West Star's motion to enforce the settlement agreement and, at the same time, ruled that the Robisons' motion for partial summary judgment was moot. Six months later, on August 26, 2010, West Star filed a motion to sever its breach of contract counterclaim from the Robisons' personal injury cause of action. Although the case was set for trial on September 27, 2010, on September 14th, the trial court severed West Star's settlement counterclaim from the

3

underlying case, abated the underlying case and set the counterclaim for trial.[1] Despite the fact that it had previously determined the alleged settlement agreement did not comply with Rule 11, the trial court then denied the Robisons' motion for summary judgment as to West Star's counterclaim. As a result, the Robisons initiated mandamus proceedings in this Court that concluded in the conditional granting of a writ of mandamus directing the trial court to grant summary judgment in favor of the Robisons on West Star's then-severed counterclaim for breach of the alleged settlement agreement. *In re Robison*, 335 S.W.3d 776 (Tex. App.—Amarillo 2011, orig. proceeding). West Star attempted to countermand the effect of that ruling by filing a new petition for mandamus with the Texas Supreme Court. That petition was ultimately denied on August 31, 2012.[2] On September 28, 2012, the trial court vacated the severance and consolidated the proceedings back into a single cause of action bearing the original cause number. The trial court then granted the Robisons' traditional and no-evidence motions for summary judgment, ruling that West Star take nothing by its counterclaim.

Subsequently, the case proceeded to trial. Before trial, the parties stipulated that Charles incurred reasonable and necessary medical expenses in the amount of $250,618.92. Following five days of testimony, the trial court submitted the Robisons' liability question to the jury in a single issue asking, "Did the negligence, if any, of [West Star] proximately cause the occurrence in question?" That issue was preceded by the "standard" instruction defining "negligence" to mean "the failure to use ordinary care;

---

[1] The severed cause of action was assigned cause number 2009-546,118-B, under the style "*West Star Transportation, Inc., Plaintiff, versus Charles Robison and Cherie Robison.*"

[2] *See* http://www.search.txcourts.gov/SearchMedia.aspx?MediaVersionID=7090f8dd-975b-4eed-8990-0e3c658e891d&coa=cossup&DT=PET MAND DISP&MediaID=7bf0cc87-3173-4834-a638-5b080ac14095

that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." The jury answered the negligence question "yes" as to West Star.

In response to question two pertaining to Charles's damages, the jury also found (1) past physical pain and mental anguish: $300,000, (2) future physical pain and mental anguish: $700,000, (3) past loss of earning capacity: $168,540, (4) future loss of earning capacity: $243,184, (5) past physical impairment: $5,000, (6) past medical care: $378,718, and (7) future medical care: $3,337,857. In response to question three pertaining to Cherie's damages, the jury found (1) past loss of consortium: $250,000 and (2) future loss of consortium: $150,000.

Based upon prior stipulations and the jury's verdict, on January 18, 2013, the trial court entered a final judgment in favor of the Robisons and against West Star. In accordance with one of the prior stipulations, the judgment credited West Star for benefits its insurer had already paid and awarded actual damages to Charles in the amount of $4,898,590.78 and to Cherie in the amount of $400,000. The judgment also awarded prejudgment interest, postjudgment interest and court costs. West Star subsequently filed its notice of appeal. We affirm the judgment of the trial court.

SINGLE OR MULTIPLE "THEORIES" OF RECOVERY

Much of West Star's arguments pertaining to issues one and two center on its contention that the Robisons were asserting multiple and distinct theories of liability. By its first issue, West Star contends the evidence was legally or factually insufficient as to

5

three specific "theories" of liability: (1) failure to use fall protection or other mechanical devices to assist tarping, (2) failure to require a pre-planning meeting, and (3) failure to implement a policy whereby West Star would refuse to tarp over-sized loads. By its second issue, West Star contends the trial court erred in submitting to the jury a broad-form negligence question which allowed the jury to find it negligent based on any one of the "multiple and distinct theories of liability" alleged by the Robisons. For purposes of logical discussion we will address West Star's second issue first.

ISSUE TWO—BROAD FORM SUBMISSION

Broad-form submission is the preferred method of presentation of issues to the jury. *Isaacs v. Bishop,* 249 S.W.3d 100, 108 (Tex. App.—Texarkana 2008, pet. denied). In fact, Rule 277 of the Texas Rules of Civil Procedure explicitly provides that the court "shall, whenever feasible, submit the cause upon broad-form submission." *See* TEX. R. CIV. P. 277. That preference notwithstanding, for many years Texas trial courts have understood that it commits error by submitting a single broad-form liability question that comingles "invalid" theories of liability with "valid" theories of liability. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000).

West Star's general contention that the trial court erred by submitting multiple and distinct theories of recovery is misguided because the Robisons were not submitting distinct *theories* of liability. From the time the Robisons filed their original petition, they have always contended that West Star was "negligent in failing to provide a reasonably safe place to work." While much to-do has been made about different "theories of liability" by focusing on various testimony offered concerning what steps could have been taken to make West Star's shipping yard a safe work environment, that

6

evidence was equally admissible for purposes of showing that on April 23, 2007, the work place presented by West Star to Charles was unreasonably dangerous.

Accordingly, we find that West Star's multiple and distinct theories argument more appropriately goes to the evidentiary weight of various acts of purported negligence and does not constitute a distinct "theory" of liability as contemplated by *Casteel.* Because the issue was, is, and always has been the single liability theory concerning whether West Star was negligent in failing to provide a reasonably safe place to work, we overrule issue two and proceed to an analysis of issue one concerning the sufficiency of the evidence as to negligence and proximate cause.

ISSUE ONE—NEGLIGENCE AND PROXIMATE CAUSE

Because West Star is a workers' compensation nonsubscriber, it is not afforded the common-law defenses of contributory negligence, assumption of risk, or negligence of a fellow servant. *See* TEX. LAB. CODE ANN. § 406.033(a) (West Supp. 2014), *Kroger Co. v. Keng*, 23 S.W.3d 347, 350 (Tex. 2000). Accordingly, in order to recover, Charles and Cherie were only required to establish negligence and two causal nexuses: (1) a causal nexus between the defendant's conduct and the event sued upon and (2) a causal nexus between the event sued upon and the claimant's injuries. *See Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010); *Integrated of Amarillo, Inc. v. Kirkland*, 424 S.W.3d 131, 136 (Tex. App.—Amarillo 2014, no pet.); *Forrest v. Vital Earth Res.*, 120 S.W.3d 480, 489 (Tex. App.—Texarkana 2003, pet. denied).

The causal nexus required to support recovery is "proximate cause," which consists of two elements, cause-in-fact and foreseeability. *IHS Cedars Treatment Ctr.,*

7

*Inc. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2004). Cause-in-fact is established when the act or omission was a substantial factor in bringing about an event, and without which cause such event would not have occurred. *Id.* The mere occurrence of an event causing injury does not establish negligence. *Allsup's Convenience Stores, Inc. v. Warren*, 934 S.W.2d 433, 436 (Tex. App.—Amarillo 1996, writ denied). In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. *City of Gladewater v. Pike*, 727 S.W.2d 514, 524 (Tex. 1987). There may be more than one proximate cause of an event. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010). The test for cause-in-fact is whether the act or omission was a substantial factor in bringing about the injury "and without it, the harm would not have occurred." *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799. More than one act or omission may be the proximate cause of the same injury. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). Therefore, if West Star's conduct was negligent and a substantial factor in bringing about Charles's injuries and without it the harm would not have occurred, then there is a sufficient cause-in-fact to establish proximate cause.

To establish negligence, a party is required to establish the breach of a duty owed to the injured party, together with damages proximately caused by that breach. *Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex. 1995); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). Whether a duty exists is a threshold inquiry and a question of law. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006).

Although an employer is not an insurer of his employee's safety at work, every employer owes its employees a primary, continuing, and nondelegable duty to use ordinary care in providing a reasonably safe work place. See *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 754 (Tex. 1975) ("It is well established that an employer has certain nondelegable and continuous duties to his employees. Among these are the duty to . . . furnish a reasonably safe place in which to labor and the duty to furnish reasonably safe instrumentalities with which employees are to work."). *See also Werner*, 909 S.W.2d at 869 (citing *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1987)). Accordingly, an employer may not place an employee in an unreasonably dangerous work environment without taking appropriate precautions. Furthermore, although an employer owes no duty to warn of hazards that are commonly known or already appreciated by the employee, liability cannot be avoided by merely alleging the hazard is known or appreciated when the employer has created a work environment where an employee is required to perform a task in an unsafe manner. *Elwood*, 197 S.W.3d at 794. *See also Town & Country Mobile Homes, Inc. v. Bilyeu*, 694 S.W.2d 651, 655 (Tex. App.—Fort Worth 1982, no writ) (employer found negligent for providing employee an unsafe means of getting down from a trailer that was approximately four feet off the ground). In addition to the duty to adequately warn an employee of the hazards of employment not commonly known or appreciated, an employer must provide needed safety equipment, suitable appliances, or sufficient assistance so that the employee may carry out his or her assigned duties with reasonable safety. *Elwood*, 197 S.W.3d at 794; *Forrest*, 120 S.W.3d at 489. The duty to provide a safe work environment also includes an obligation to provide adequate help under circumstances where that assistance would be

9

necessary for the safe performance of the work required. *Werner*, 909 S.W.2d at 869 (citing *Western Union Tel. Co. v. Coker,* 146 Tex. 190, 240 S.W.2d 977, 978 (1947).

## STANDARD OF REVIEW

When, as here, both legal and factual sufficiency challenges are raised on appeal, the reviewing court must first examine the legal sufficiency of the evidence. *See Glover v. Tex. Gen. Indemnity Co.,* 619 S.W.2d 400, 401 (Tex. 1981). If the evidence is legally sufficient, we will then proceed to an examination of the factual sufficiency of the evidence.

### LEGAL SUFFICIENCY

In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports the verdict. *City of Keller v. Wilson,* 168 S.W.3d 802, 821-22 (Tex. 2005). Evidence will be found to be legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. In conducting a legal sufficiency analysis this Court must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and of the weight to be given to their testimony. *Id.* at 819. The reviewing court may not substitute its judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822. But if the evidence allows only one inference, neither the jurors nor the reviewing court may disregard it. *Id.*

In reviewing a legal sufficiency issue, we may sustain the challenge only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of the vital fact in question. *Keller* 168 S.W.3d at 810; *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied,* 541 U.S. 1030, 124 S. Ct. 2097, 158 L. Ed. 2d 711 (2004).

FACTUAL SUFFICIENCY

In reviewing factual sufficiency, the reviewing court must consider, examine, and weigh the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406-07 (Tex. 1998), *cert. denied,* 525 U.S. 1017, 119 S. Ct. 541, 142 L. Ed. 2d 450 (1998). In doing so, the court no longer considers the evidence in the light most favorable to the finding; instead, the court considers and weighs all the evidence and sets aside the disputed finding only if it is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* at 407.

ANALYSIS

As a nonsubscriber, the only defense available to West Star was to show that it was not guilty of negligence proximately causing the injuries or that Charles himself was guilty of some act which was the sole proximate cause of the occurrence. *Sears, Roebuck & Co. v. Robinson*, 154 Tex. 336, 280 S.W.2d 238, 239 (1955). Accordingly, if

any negligent act by West Star was a substantial factor in bringing about Charles's fall and subsequent injuries, and if that event was a foreseeable occurrence without which the fall and injuries would not have occurred, then liability has been established.

As previously stated, the Robisons contend West Star was negligent and breached its duty to provide a reasonably safe place to work when it presented Charles with the unreasonably dangerous task of tarping a thirteen foot high load. West Star contends the evidence was legally and factually insufficient to support the jury's conclusion that its negligence proximately caused the injuries sustained by Charles. Specifically, West Star avers there was no evidence that it (1) failed to warn, train or supervise Charles, (2) failed to provide adequate fall protection or other safety equipment, (3) failed to provide a reasonably safe work place or (4) failed to act as a reasonable employer of ordinary prudence.

Relying on *Kroger Co. v. Elwood*, West Star posits it owed no duty to warn, train or supervise Charles because he was an experienced flatbed truck operator with over thirty years of experience. In *Elwood,* a grocery store employee brought a negligence action against his employer after he was injured when a customer slammed a car door on his hand as he was transferring items from a grocery cart to her vehicle. The Supreme Court held that, while the duty of ordinary care generally requires an employer to "warn an employee of the hazards of employment and provide needed safety or equipment assistance," the employer "owes no duty to warn of hazards that are commonly known or already appreciated by the employee." *Elwood,* 197 S.W.3d at 794*.* Here, the dangers associated with man-handling a 150-pound tarpulin while standing on the top of an uneven and over-sized load are not nearly as apparent as

placing your hand in the doorjamb of a door being operated by a third person. Furthermore, the need for training and supervision in the two scenarios is not comparable.

West Star further argues that, even if it did owe a duty to warn, train or supervise Charles, there was no evidence it breached any duty owed. In support of this argument, West Star contends it was engaged in "ongoing monitoring" and on-the-job training of its employees. Nevertheless, the evidence shows that the load being worked on by Charles was an unusually large load that presented an unreasonably dangerous work environment in the absence of appropriate safety precautions or assistance. By accepting a load of that size, West Star created an unusually precarious work environment and an unreasonable risk of harm to its employees—a risk that proved to be true when Charles fell and was injured. Charles was performing a task that was unusually precarious and not of the same character of work that he customarily performed and he was doing so without any special supervision or safety equipment. In fact, West Star did not even own the equipment necessary to safely perform the task at hand, choosing instead to borrow a forklift from another business in order to have a means of raising a 150-pound tarpaulin to the top of a load reaching thirteen feet in height. Furthermore, Charles was allowed to be lifted to the top of the load while standing on the pallet carrying the tarpaulin, without a safety harness or other fall-prevention equipment. Additionally, West Star did not provide other supervision or assistance. Under these circumstances, the failure to provide needed safety equipment, suitable tools or sufficient assistance contributed to the danger associated with the task, and the absence of these safety policies, procedures and equipment constitutes evidence of the unreasonableness of the task and the risks West Star was

13

willing to assume when it asked Charles to mount that trailer and cover an uncommonly high load.

But for West Star's decision to accept that load in the absence of those precautions, Charles would not have been injured that day. In light of West Star's lack of preparedness, that decision was negligent in that it constituted the failure to use ordinary care; that is, West Star failed to do that which a shipper of ordinary prudence would have done under the same or similar circumstances, to-wit: either refuse a load requiring unreasonably dangerous tarping or take appropriate safety precautions. Furthermore, West Star did what a shipper of ordinary prudence would not have done under the same or similar circumstances, to-wit: it accepted a load that presented an unreasonably dangerous work environment for its employees. Because the evidence was both legally and factually sufficient to support the jury's verdict as to negligence and proximate cause, we overrule issue one.

ISSUE THREE—DAMAGES

By its third issue, West Star maintains the evidence was both legally and factually insufficient to support a portion of the jury's award of damages. Specifically, West Star contends Charles did not prove that, in reasonable probability, he would sustain future pain and mental anguish. West Star further contends the jury's award of $243,184 for loss of future earning capacity impermissibly included sums that Charles earned in the past and that the award of $3,337,857 in future medical expenses impermissibly included expenses for which Charles has already been compensated. Alternatively, West Star contends the jury's awards are excessive.

14

As a general principle, we remain mindful that the amount of damages awarded is a matter uniquely within the prerogative of the fact finder, particularly as it pertains to subjective damages such as pain and mental anguish. *Scott's Marina at Lake Grapevine, Ltd. v. Brown*, 365 S.W.3d 146, 158 (Tex. App.—Amarillo 2012, pet.denied). "[I]t is only when [a jury's] award of damages is 'flagrantly outrageous, extravagant, and so excessive as to shock the judicial conscience,' that it may be disturbed." *Id.* (quoting *Missouri Pac. R.R. Co. v. Roberson*, 25 S.W.3d 251, 257-58 (Tex. App.—Beaumont 2000, no pet). The standard of review for a challenge contending that an award of damages was excessive is the same as the standard used in a factual sufficiency review. *Id.*

### FUTURE PHYSICAL PAIN AND MENTAL ANGUISH

In response to a granulated damages issue, the jury awarded $700,000 for "physical pain and mental anguish" that, in reasonable probability, Charles would sustain in the future. West Star contends the evidence does not support the existence or amount of these future damages and it begins its argument by attacking the "mental anguish" aspect of the jury's verdict.[3] *See Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 860 (Tex. 1999) (noting that courts should "closely scrutinize" awards of mental anguish damages). The jury's verdict was not, however, limited to mental anguish damages, and it specifically included damages for physical pain Charles would, in reasonable probability, sustain in the future. As it pertains to the pain aspect of the

---

[3] West Star does not challenge the jury's finding that Charles sustained damages of $300,000 for physical pain and mental anguish in the past. West Star merely contends the evidence is legally and factually insufficient to establish he will, in reasonable probability, continue to sustain similar damages in the future.

15

jury's verdict, West Star simply contends that neither Charles nor any physician ever testified that he would likely never be pain-free.

In reaching its decision, the jurors had before it Charles's medical records which provided details regarding his injuries. In addition, they heard expert medical testimony regarding the nature and extent of his injuries detailing how he sustained a traumatic brain injury, including the loss of brain material, which will significantly affect him for the remainder of his life. They also heard testimony concerning how his injuries affected his long-term emotional stability resulting in anger management issues and depression. In sum, this evidence is legally and factually sufficient to support the jury's damage verdict pertaining to the future aspect of his physical pain and mental anguish.

LOST EARNING CAPACITY IN THE FUTURE

The jury also awarded Charles $243,184 for the loss of earning capacity that, in reasonable probability, he would sustain in the future. West Star contends this figure impermissibly includes damages that were sustained in the past. Specifically, West Star contends the economist who testified as to the loss of earning capacity improperly differentiated between *past loss of earning capacity* and *future loss of earning capacity* because he drew the line between the two as of the date of his report rather than the date of trial. *See Bituminous Casualty Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex. App.—Amarillo 2006, no pet.) (holding that "[l]oss of *past* earning capacity is the plaintiff's diminished capacity to earn a living during the *period between the injury and the date of trial*," and "[l]oss of *future* earning capacity is the plaintiff's diminished capacity to earn a living *after trial*") (emphasis added). West Star reasons that it was harmed because the jury's award for future loss of earning capacity necessarily

16

included losses which accrued between the time the report was prepared and the date of trial.

Testimony from the Robisons' economist, a person West Star stipulated was qualified to render an expert opinion, established that Charles's lost earning capacity in the past was $168,540, and in the future was $214,942 if he retired at age 65, or $243,184 if he retired at age 66.[4] The jury awarded $168,540 for loss of earning capacity sustained in the past and $243,184 for loss of earning capacity that, in reasonable probability, would be sustained in the future. As such, the jury did not award overlapping damages for the loss of earning capacity sustained by Charles. Without further analysis, this testimony alone is sufficient to enable *any* reasonable and fair-minded person to reach the verdict under review and that verdict was not so contrary to the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Accordingly, we find the evidence is legally and factually sufficient to support the jury's damage verdict pertaining to lost earning capacity in the future.

FUTURE MEDICAL EXPENSES

Finally, and for similar reasons, West Star contends the evidence does not support the full award of $3,337,857 for future medical care expenses. For future medical expenses to be recoverable, the evidence must establish that there is a reasonable medical probability that such expenses will be incurred in the future. *Scott's Marina*, 365 S.W.3d at 160. West Star suggests the evidence is legally and factually insufficient because that figure was based upon a life care plan prepared by a

---

[4] Unquestionably, the line of demarcation the expert used to differentiate between past and future loss of earning capacity was "the date of my writing the report." That date, however, was never presented to the jury.

17

rehabilitation physician nearly three years before trial. The life care plan contained various estimates based on different assumptions. Option I was based on the assumption that Charles would receive care from a spouse or family member while remaining in the home. Under this option, the witness opined that future medical care would cost $1,970,618. Option II assumed Charles would receive care from a facility or institutional type model and that future medical care based on this assumption would cost $3,717,518.28.[5] A third option assumed Charles would receive care from a facility which would provide more closely supervised care than that provided in Option II. Using this option, the rehabilitation physician projected that future medical care could cost as much as $5,528,824.52.[6] The rehabilitation physician did not reduce any of the figures in his plan to their present values and instead relied upon the economist to do so.

While a jury may follow the testimony of an expert witness as to future medical expenses, it may also consider the nature of the plaintiff's injuries, as well as the nature and extent of medical care rendered before trial and the plaintiff's condition at the time of trial. *Scott's Marina,* 365 S.W. 3d at 160. Because the jury verdict for future medical care was within the range of estimates supported by the testimony of the rehabilitation physician and the economist, we find the evidence is legally and factually sufficient to support the jury's damage verdict pertaining to future medical expenses. Issue three is overruled.

---

[5] The economist testified that the present value of this amount would be $3,337,857—the amount actually awarded by the jury.

[6] The present value of this amount was $5,412,014.

18

By its fourth and final issue, West Star contends the trial court erred in granting a partial summary judgment in favor of Charles and Cherie as to its affirmative defense of settlement and its counterclaim for breach of contract. Specifically, West Star's complaint has three subparts: (1) this Court should not have reviewed via mandamus the trial court's interlocutory orders concerning the affirmative defense of settlement or the counterclaim for breach of contract, (2) the trial court erred in granting Charles and Cherie's no-evidence motion for partial summary judgment because West Star's affirmative defense of settlement was not based on Rule 11 and (3) the trial court erred in granting partial summary judgment because there were genuine issues of material fact concerning whether the settlement agreement complied with Rule 11.

While West Star spends much of its brief attempting to articulate perceived "procedural irregularities" heretofore previously rejected by the Texas Supreme Court,[7] ultimately, its complaint is that the trial court's orders granting summary judgment deprived it of the affirmative defense of settlement and the related counterclaim for breach of contract. Therefore, essential to any construction of West Star's complaint of non-harmless error is its contention that there was, in law and in fact, a binding agreement with Charles and Cherie to settle the claims being asserted by their lawsuit. Without an enforceable agreement to settle, West Star's complaints are merely harmless error. *See* TEX. R. APP. P. 44.1.

---

[7] *See* footnote 2, *supra.*

19

In that regard, Rule 11 of the Texas Rules of Civil Procedure mandates:

> Unless otherwise provided in these Rules, *no agreement* between attorneys or parties *touching any suit pending* will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.

(Emphasis added.)

Rule 11 was designed to avoid disputes concerning oral settlement agreements. *Padilla v. La France*, 907 S.W.2d 454, 461 (Tex. 1995). In *Kennedy v. Hyde,* 682 S.W.2d 525 (Tex. 1984), the Supreme Court stated that the policy behind Rule 11 is clear:

> The rationale underlying Rule 11 is sensible and contributes to efficient court administration. Agreements and stipulations are welcomed by the courts because they limit the matters in controversy and expedite trial proceedings. Rule 11 ensures that such agreements do not themselves become sources of controversy, impending resolution of suits. The requirements of Rule 11 are not onerous; the benefits are substantial.

*Id.* at 530 (emphasis added).

West Star contends the "in writing" requirement of Rule 11 was nonessential to the formation of an agreement because the original offer of settlement "specified only the *time* for acceptance of the offer (i.e., by 5:00 p.m. on May 8); it did not specify the *manner* of acceptance or require that any acceptance be in writing." The Robisons disagree. West Star's argument completely ignores the plain language of Rule 11 which requires that any settlement agreement of a pending suit be in writing and this kind of dispute concerning the enforceability of a settlement agreement is the very scenario the "in writing" requirement of Rule 11 was designed to prevent.

West Star further contends that, even if Rule 11 did apply, the "in writing" requirement was met by the written settlement offer itself and, therefore, the trial court erred in granting summary judgment because West Star's oral acceptance of that offer presented a disputed fact issue. Even assuming that a factual dispute existed as to whether West Star orally accepted the settlement offer via McCathern's telephone conversation with Carter, that is not a dispute pertaining to a relevant issue because West Star's oral acceptance of the settlement offer, even if it occurred, does not comply with the "in writing" requirement of Rule 11. Because there were no genuine issues of material fact pertaining to the existence of an enforceable settlement agreement, the trial court did not err in granting summary judgment in favor of the Robisons on the issues of the affirmative defense of settlement or the counterclaim for breach of contract. Because there was no enforceable settlement agreement, West Star was not harmed by the trial court's granting of summary judgment. Accordingly, issue four is overruled.

CONCLUSION

The judgment of the trial court is affirmed.

Patrick A. Pirtle
Justice

21