

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00040-CV

_____

CHARLES DUNCAN MCMILLAN D/B/A ANTHONY SIGN COMPANY, Appellant

V.

KELLY SHANE HEARNE, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 85944

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

OPINION

On November 2, 2016, Kelly Shane Hearne filed a personal injury suit against his employer, Charles Duncan McMillan d/b/a Anthony Sign Company (McMillan), a nonsubscriber to the workers'compensation system. *See* TEX. LAB. CODE ANN. § 406.033. Hearne alleged that on September 14, 2015, while he was at the top of a commercial extension ladder, he fell as a result of the ladder slipping after McMillan stopped supporting the ladder at the bottom. The jury found that McMillan was liable for Hearne's injuries, and it awarded him past and future damages in the amount of $427,818.38.

McMillan appeals, maintaining that (1) the evidence was legally and factually insufficient to support the jury's finding of negligence and (2) the trial court committed reversible error by failing to offset the jury's award of past medical damages in the appropriate amount. Hearne cross-appealed, contending that (1) the trial court erred in failing to render judgment on the jury verdict for all the past damages awarded by the jury, (2) even if the trial court had authority to award an offset to McMillan, it erred in doing so because the offset violated the collateral source rule and McMillan failed to obtain findings on which he had the burden of proof, and (3) alternatively, the judgment should be modified to reflect an offset in past damages in the amount of $65,521.88.

For the reasons below, we affirm the trial court's judgment, as modified.

I.    **Background**

In September 2015, McMillan had been hired to restore the marquee sign of the Grand Theatre in Paris, Texas. At the time, Hearne had been working for McMillan for about twenty-five years. According to Hearne, per McMillan's instructions, he had gone to the theatre in the

2

company bucket truck where he tried, but failed, to reach the sign by using the bucket. In a subsequent effort to reach the sign, Hearne intended to access the roof from the inside of the theatre. To that end, Hearne contacted McMillan and asked him to bring the thirty-foot-long extension ladder that was kept on McMillan's truck. McMillan complied with Hearne's request and brought the ladder to the theatre.

Hearne testified that after McMillan arrived, he carried the "fly" or expansion portion of the ladder inside the theatre, while McMillan carried the bottom portion of the ladder. According to Hearne, the two of them began to position the fly portion of the ladder to access the theater attic. Hearne then climbed the ladder while McMillan held it at the bottom. When Hearne reached the attic, he realized his flashlight was not working. Hearne told McMillan that he needed to retrieve another flashlight or find some new batteries. Hearne testified that he believed McMillan would wait for him to descend the ladder.

Hearne began descending the ladder; however, when he looked down, he saw that McMillan had walked away from the ladder and was exiting the theatre. According to Hearne, the ladder almost immediately slipped, and Hearne fell to the concrete floor. Hearne attempted to save himself by reaching around him, but because the attic floor was made of smooth plywood, there was nothing he could hold onto.

McMillan disputed Hearne's version of events. McMillan testified that when he arrived at the theatre, he carried the extension ladder into the building and placed it on the floor near the area in which Hearne was standing. McMillan testified that he told Hearne "to hold on and that he was going to go retrieve a flashlight." When asked where Hearne was located at the time he went to

3

get the flashlight, McMillan stated, "Standing right where he had been, right between where I was standing and where the hatch was -- or where the -- area of the hatch." According to McMillan, both Hearne and the extension ladder were standing on the floor when he walked out of the theatre.

McMillan explained that the truck was near the theatre door. He stated, "So I just walked around it, opened up the side bin, and was about to -- I think I picked up the flashlight, and then I heard [Hearne] screaming." McMillan ran back inside the theatre where he saw Hearne "laying on the floor in pain." McMillan stated that the ladder was on the ground in its extended position. Thus, McMillan maintained that he was not present when Hearne fell and that he never supported the ladder for Hearne.

Immediately following his fall, Hearne was airlifted to the Medical Center of Plano, where he received surgery on his hip. Two or three days later, he underwent surgery on his wrist, elbow, and shoulder. According to Hearne, three of his ribs and his collarbone were also broken. Although McMillan did not carry workers' compensation insurance, he provided an Occupational Injury Benefit Plan (the Plan) that paid certain benefits, including medical expenses to, or on behalf of, Hearne. After the incident, Hearne sued McMillan for negligence. McMillan sought an offset against the damages paid to Hearne for benefits paid by the Plan. The jury found in favor of Hearne. The trial court found that McMillan was entitled to an offset in the amount of $91,911.02. It then entered judgment in favor of Hearne for the amounts awarded by the jury, less offset. This appeal followed.

4

**II.    The Evidence Was Sufficient to Support the Trial Court's Judgment Regarding McMillan's Liability to Hearne**

**A.    Introduction**

Hearne contends that McMillan was negligent when he, among other things, (1) failed to adequately help Hearne in the performance of his work, (2) failed to provide a safe place for McMillan to work when he provided him with an unsafe ladder, and (3) failed to inspect the ladder. In his first and second issues, McMillan contends that there was legally and factually insufficient evidence to support the jury's finding of negligence.

**B.    Standard of Review**

In determining legal sufficiency, the appellate court examines "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In looking at the evidence, we credit favorable evidence if a reasonable jury could and disregard evidence unless a reasonable jury could not. *Id*. The evidence is legally insufficient if

> (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.

*Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 618–19 (Tex. App.—Fort Worth 2011, pet. denied) (citing *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998)); *see Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010).

More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v.*

5

*Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

When reviewing a jury verdict for factual sufficiency of the evidence, we consider and weigh all the evidence and only set aside the verdict if "we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Chesser*, 356 S.W.3d at 619 (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)); *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

C.    **Applicable Law**

To prove negligence, evidence must be produced to establish a duty, a breach of duty, and damages proximately caused by the breach. *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004). Because McMillan is a worker's compensation nonsubscriber, McMillan is not afforded the common-law defenses of contributory negligence, assumption of the risk, or negligence of a fellow servant. *See* TEX. LAB. CODE ANN. § 406.033(a); *Kroger v. Keng*, 23 S.W.3d 347, 350 (Tex. 2000). Thus, there are only two defenses available to McMillan, namely, (1) that he was not liable for negligence proximately causing Hearne's injuries or (2) that Hearne was responsible for some act which was the sole proximate cause of the occurrence. *See W. Star Transp. v. Robinson*, 457 S.W.3d 178, 187 (Tex. 2015). "Accordingly, if any negligent act by [McMillan] was a substantial factor in bringing about [Hearne's] fall and subsequent injuries, and

6

if that event was a foreseeable occurrence without which the fall and injuries would not have occurred, then liability has been established." *See id*.

**D.   Analysis**

**1.   McMillan Owed a Duty of Care to Hearne, and He Breached that Duty**

**a.   Applicable Law**

An employer has a primary, continuing, and nondelegable duty to provide a safe place and safe conditions in which employees may work. *Cabrera v. Delta Brands, Inc.*, 538 S.W.2d 795, 797 (Tex. Civ. App.—Texarkana 1976, writ ref'd n.r.e.). In addition, an employer has a duty to furnish the employee with safe and suitable equipment so that he may carry on the work with reasonable safety. *Fort Worth Elevators Co. v. Russell*, 70 S.W.2d 397, 401 (1934), *overruled on other grounds by Wright v. Gifford-Hill & Co.*, 725 S.W.2d 712 (Tex. 1987). An employer also has a duty to provide safety regulations. *Woodlawn Mfg., Inc. v. Robinson*, 937 S.W.2d 544 (Tex. App.—Texarkana 1996, writ denied).

McMillan contends that the "simple tool doctrine" negated any duty he had to, among other things, furnish a safe ladder or train Hearne on how to safely operate the ladder. The simple tool doctrine relieves an employer of the duty to inspect a tool if that tool is committed to the control and care of the employee and is of such character that the employee who handles it should be fully acquainted with its condition. *City of Houston v. Howard*, 786 S.W.2d 391, 395 (Tex. App.—Houston [14th Dist.] 1990, writ denied). In support of his position, McMillan relies on *Swearingen v. Bell*, 307 S.W.2d 132 (Tex. Civ. App.—San Antonio 1957, no writ).

7

In *Swearingen*, the plaintiff, a carpenter, fell off a four-foot ladder while doing repair work for his employer and was injured as a result of the fall. Citing the simple tool doctrine, the San Antonio Court of Appeals held that the ladder was a common tool. *Id*. at 133. It then held that "a master is not required to inspect the common tools and appliances which are committed to the custody of a servant who has the capacity to understand their character and uses." *Id.* at 133.

### b. Discussion

Pointing out that Hearne had been McMillan's employee for more than twenty-years and that he was required to use ladders frequently in carrying out his tasks, McMillan maintains, "Having entrusted the ladder to Mr. Hearne's use, as a common tool, [he] owed no duty to instruct Mr. Hearne on its use, warn him of its dangers, or conduct regular safety inspections of the ladder." Hearne conceded that he used the ladder frequently and was aware the ladder had been modified.[1] However, although Hearne had used the ladder on a frequent basis, the evidence in this case does not show that the ladder was committed to Hearne's exclusive control or that Hearne was responsible for its care.

Moreover, the ladder was a modified, thirty-foot commercial extension ladder consisting of two separate pieces[2] and not, as was the case in *Swearingen*, a four-foot ladder. More importantly, however, because McMillan was not afforded the common-law defenses of

---

[1]There was evidence in the record showing that when the ladder came from the manufacturer, it had feet made of rubber. According to McMillan, at the time of Hearne's fall, the feet were attached with "something that's removable, like a bolt and a nut or a screw and a nut . . . something like that." McMillan concedes that the ladder had been modified.

[2]Although he was not certain, McMillan approximated that the ladder weighed forty-five to fifty pounds; however, Hearne presented evidence that it weighed about seventy-five pounds.

contributory negligence, assumption of the risk, or negligence of a fellow employee due to his nonsubscriber status, Hearne's knowledge of the ladder's components, its use, or any safety precautions known by Hearne is of little, if any, consequence. *See Kroger*, 23 S.W.3d at 350. For these reasons, we find the simple tool doctrine inapplicable in this case, and McMillan had a duty to provide a safe work environment, including, among other things, the "obligation to provide adequate help under circumstances where that assistance would be necessary for the safe performance of the work required." *See Robinson*, 457 S.W.3d at 186.

Because Hearne testified that McMillan stopped supporting the ladder as he was descending, Hearne's testimony is some evidence establishing that McMillan breached his duty of care to Hearne. Although McMillan disputed Hearne's testimony, the jury, as fact-finder, was free to reject McMillan's version of events and accept Hearne's. Accordingly, the evidence in this case was sufficient to establish that McMillan breached his duty of care to Hearne and, therefore, was negligent.

### 2. McMillan's Negligence Proximately Caused Hearne's Injuries

#### a. Applicable Law

Proximate cause consists of both cause in fact and foreseeability, both of which must be shown to exist. *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 935 (Tex. App.—Texarkana 1997, writ denied). Whether a particular act of negligence is a proximate cause of an injury is ordinarily a question for the jury. *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970). "Only in exceptional cases should jury findings on proximate cause be set aside on the ground that they are

9

not supported by the evidence." *Wal-Mart Stores, Inc. v. Barry*, 833 S.W.2d 587, 590 (Tex. App.—Texarkana 1992, writ denied) (citing *Enloe v. Barfield*, 422 S.W.2d 905, 908 (Tex. 1967)).

Cause in fact "requires proof that an act or omission was a substantial factor in bringing about injury which would not otherwise have occurred." *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995) (citing *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993)). "In order for a negligent act or omission to be a 'cause in fact' it must be one 'but for which' the accident or injury would not have occurred; that is, the proof must show that the act or omission produced the event and without such act or omission the event would not have occurred." *Clifton v. Wilson Indus., Inc.*, 589 S.W.2d 498, 500 (Tex. App.—Texarkana 1979, writ ref'd n.r.e.).

### b.    Analysis

McMillan maintains that Hearne was unsuccessful in proving that but for McMillan's actions, Hearne would not have fallen. McMillan contends that the only testimony offered by Hearne as to the cause of his injuries was that of Hearne's expert, Jason English, a safety engineer, and that his testimony was insufficient to prove causation.[3] McMillan also maintains that although

---

[3]McMillan emphasizes the *Robinson* factors in relation to the admission of English's testimony. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). In *Robinson*, the court stated that there were many factors a trial court could consider in making the threshold determination of the admissibility of an expert's opinion, including:

    (1)      the extent to which the theory has been or can be tested;
    (2)      the extent to which the technique relies upon the subjective interpretation of the expert[;]
    (3)      whether the theory has been subjected to peer review and/or publication;
    (4)      the technique's potential rate of error;
    (5)      whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
    (6)      the non-judicial uses which have been made of the theory or technique.

*Id*. at 557 (citations omitted).

the occurrence complained of—falling off a ladder—was within the general experience of the jury, the causal connection between Hearne's falling off the ladder and any breach of duty by McMillan was not.

Establishing causation in this case required Hearne to bring forth sufficient facts so that the evidence, and its logical inferences, supported a reasonable probability that McMillan's actions were a substantial factor in bringing about his injuries. *See Odell*, 948 S.W.2d at 935. However, Hearne was not required to exclude every other possibility for his fall. *See Forrest v. Vital Earth Res.*, 120 S.W.3d 480, 491 (Tex. App.—Texarkana 2003, pet. denied). Rather, he was only required to present proof of a causal connection beyond the point of conjecture or mere possibility. *See Lenger v. Physician's Gen. Hosp.*, 455 S.W.2d 703, 706 (Tex. 1970).

Moreover, lay opinion is adequate to prove causation where general experience and common sense enable a layperson to determine, with reasonable probability, the causal relationship between the event and the condition. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984). "Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient to prove

---

McMillan maintains that English did not conduct or cite any testing or authority to support his theories that the condition of the ladder caused the ladder to slip and Hearne to fall. McMillan contends that at the time English made his report, he had no information about the incident other than what he had been told by Hearne's counsel. According to McMillan, English never visited the accident site or examined the ladder at issue; instead, he relied only on photographs.

In response, Hearne contends that the attack on the admission of English's testimony is misplaced. According to Hearne, McMillan misstated the relevant legal standard by erroneously focusing on the *Robinson* factors, which he contends are appropriately used for challenging "scientific" evidence. In *Gammill v. Jack Williams Chevrolet, Inc.*, 927 S.W.2d 713, 725–26 (Tex. 1998), the court found that the *Robinson* factors were not applicable when the challenged testimony was based on an expert's individual skill, experience, and training. *Id*. at 722. Thus, contrary to McMillan's contention, and as we explain below, expert testimony is not always held to a scientific standard, and such testimony is not always necessary to prove causation in a negligence case.

causation." *Id.* (citing *Griffin v. Tex. Employer's Ins. Ass'n*, 450 S.W.2d 59, 61 (Tex. 1969)); *see also N. Assurance Co. of Am. v. Taylor*, 540 S.W.2d 832 (Tex. Civ. App.—Texarkana 1976, writ ref'd n.r.e.).

Both at trial and on appeal, Hearne relies heavily on the allegations that (1) McMillan had a duty to continue supporting the ladder while he was on the ladder, (2) he breached that duty by abruptly letting go of it, and (3) his fall, and resulting injuries, occurred because of McMillan's actions. Here, "causation was not a matter for experts alone and did not require a technical or scientific explanation; it was within the jury's ability to determine on its own what caused the accident and resulting injuries." *See Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 161 (Tex. App.—Eastland 2009, pet. denied) (citing *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 361 (Tex. 2000)).[4]

Even so, English testified that in the event the ladder was used, it should have been held. He also stated in his report that McMillan's failure to continue holding the ladder for Hearne and the unsafe condition of the ladder,[5] together with McMillan's failure to establish and implement a ladder safety and inspection program, including training, created an unreasonably dangerous work

---

[4]Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layperson. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). Expert testimony is generally necessary in medical malpractice cases and chemical exposure cases in which the medically complex diseases and causal ambiguities compound the need for expert testimony. *LeNotre v. Cohen*, 979 S.W.2d 723, 727–28 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *see also Hernandez v. Tex. Employers Ins. Ass'n*, 783 S.W.2d 250, 252–53 (Tex. App.—Corpus Christi 1989, no writ) (holding that expert testimony was necessary to determine cause of asthma, which had uncertain causal nature). Other claims require expert testimony to assist the trier of fact. *See Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 738 (Tex. App.—Amarillo 1999, pet. denied) (concluding negligence of aircraft turbine engine mechanic requires expert testimony because "performance of mechanical work on turbine aircraft engines is not within the experience of a layman").

[5]*See supra* note 2 (discussing ladder modifications). According to English, these modifications rendered the ladder unsafe for the use for which it was intended.

12

environment that ultimately caused Hearne's injuries. Regardless of whether the jury relied upon its "general experience and common sense" or whether it relied upon English's testimony, or both, the evidence established, "with reasonable probability, the causal relationship between" McMillan's act of letting go of the ladder and Hearne's fall from the top of the ladder to the concrete floor. *See Morgan*, 675 S.W.2d at 733.

The other aspect of proximate cause—foreseeability—requires proof that the actor, as a person of ordinary intelligence, anticipated the danger that his negligent actions created for others. *City of Gladewater v. Pike*, 727 S.W.2d 514, 517 (Tex. 1987). Foreseeability, in the context of causation, asks whether an injury might reasonably have been expected due to the defendant's conduct. *Id*. "It is 'a practical test, a test of common experience applied to human conduct.'" *Id*. (quoting *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)). "Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996) (citing *Lofton v. Tex. Brine Corp.*, 777 S.W.2d 384, 387 (Tex. 1989); *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985)).

McMillan argues that Hearne failed to prove foreseeability specifically. McMillan points to Hearne's lengthy work history and his familiarity with the ladder. For example, McMillan contends that the evidence showed Hearne knew that the fly portion of the ladder had been modified and that it could not have been adjusted to accommodate the ground surface. Yet, Hearne voiced no safety concerns to him, but continued to use the ladder despite knowing that there was a safer alternative. McMillan maintains that if Hearne could not have foreseen the possibility of

13

injury, then the jury could not have made a reasonable inference that McMillan could have foreseen the possibility of injury.[6]

Again, McMillan's contention omits entirely Hearne's allegation that McMillan was negligent because he abruptly stopped supporting the ladder while Hearne was at the top of it. Notably, at trial, McMillan was asked if he would ever permit someone to climb the ladder without another person at the bottom supporting it, to which he responded, "Not like that, not like what [Hearne] described." McMillan also testified that had he known "Hearne was using the ladder like he claims he used it on this concrete surface with just the fly portion with those pieces of steel or metal on the ground," he would not have allowed Hearne to do so. According to McMillan, had he known Hearne was using the ladder without someone supporting him, he would have terminated his employment.

In addition, McMillan explained how the ladder should have been supported in a "proper and safe way" in order to prevent the feet from slipping. "What I would do would be to put both of my feet on the ends of the ladder and then hold onto the side of the ladder." McMillan said that in the event he was supporting the ladder for another person, he would never walk away because "[t]oo many things could happen, and none of them would be good."

Although McMillan asserted that he had not been supporting the ladder for Hearne and that he had not walked away from Hearne while he was on the ladder, McMillan's explanation assumes that the failure to take such actions would be dangerous. Thus, McMillan's testimony constitutes

---

[6]As noted, as a nonsubscriber, McMillan is not entitled to assert the defense of contributory negligence. Accordingly, we consider this argument only to the extent McMillan argues that Hearne's inability to foresee the danger of using the ladder established that the danger was likewise unforeseeable to McMillan.

14

some evidence that such a failure would create a danger of injury to others. Therefore, McMillan's own testimony establishes the foreseeability element of proximate cause.

It is true that the jury was presented with two versions of what occurred on the day of the incident, but, as the trier of fact, the jury was the sole judge of the credibility of the witnesses and the weight to be given to the evidence. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e). As the sole judge of the weight and credibility of the evidence, the jury had the responsibility of reconciling the conflicts in the evidence and then choosing which version of facts it believed. An appellate court may not substitute its judgment for that of the trier of fact merely because it might have reached a different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988). In this case, when the jury resolved the inconsistencies in the evidence, it chose to believe Hearne's account rather than McMillan's. The jury was well within its discretion to make that determination. Accordingly, we find there was legally and factually sufficient evidence to support the jury's verdict. We overrule McMillan's first and second points of error.

**III.**   **The Evidence Was Sufficient to Support the Trial Court's Judgment Regarding Damages**

    **A.**   **Introduction and Standard of Review**

The jury awarded Hearne $162,818.38 in past damages and $265,000.00 in future damages. Yet, in its final judgment, the trial court awarded Hearne $70,907.36 in past damages, finding that McMillan was entitled to a $91,911.02 offset. In making its determination, the trial court considered payments made to Hearne, or on his behalf, from the Plan which McMillan had

procured in 2013 from the Life Insurance Company of North America.[7] Both parties challenge

the $91,911.02 offset contained in the trial court's final judgment. Resolution of the parties' points

of error requires us to interpret Section 406.033 of the Texas Labor Code, which governs

nonsubscriber cases. *See* TEX. LAB. CODE ANN. § 406.033.

In interpreting a statute, our primary objective is to give effect to the Legislature's intent.

*Kroger*, 23 S.W.3d at 349. In *Kroger*, the Texas Supreme Court discussed the legislative intent

and history of Section 406.033 since it was first enacted in 1913. *Id.* at 349–51. The Texas

Supreme Court noted that the provision currently found in Section 406.033 was enacted in 1913

and amended in 1917, but had remained essentially the same since then. *Id.* The Texas Supreme

Court then observed,

> To discourage employers from [opting out of the workers' compensation system], the Legislature included within the Act a penalty provision, similar to section 406.033, that precluded nonsubscribing employers from relying on the traditional common-law defenses—contributory negligence, assumption of the risk, and fellow servant—in defending against their employees' personal-injury actions.

*Id.* at 350.[8]

The Texas Supreme Court went on to hold that "[b]ecause we should liberally construe the

Workers' Compensation Act in favor of the injured worker, a strained or narrow construction of

section 406.033 would be improper." *Id.* Thus, it concluded, "it would be injudicious to construe

---

[7]As we discuss below, the Plan provided benefits for covered employees who sustained certain accidental on-the-job injuries.

[8]The Texas Supreme Court emphasized the importance of this principle by stating it affirmatively as well: "To encourage employers to obtain workers' compensation insurance, section 406.033 penalizes nonsubscribers by precluding them from asserting certain common-law defenses in their employees' personal-injury actions . . . ." *Kroger*, 23 S.W.3d at 349.

the statute in a manner that supplies by implication restrictions on an employee's rights that are not found in section 406.033's plain language." *Id.* Consequently, in deciding the issues in this case, we should construe Section 406.033 in Hearne's favor and avoid construing it in a manner that implies nonstatutory restrictions on his rights as an employee in a nonsubscriber case.

### B. Hearne's First Cross-Point of Error

In his first cross-point of error, Hearne contends that the trial court had no discretion to offset the jury's award of past damages; instead, he argues that issue was for the jury to determine. We first note that "[t]he right of offset is an affirmative defense." *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980). "The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion." *Id.* (citing *Sw. Bell Telephone Co. v. Gravitt*, 551 S.W.2d 421, 428 (Tex. Civ. App.—San Antonio 1977, writ ref'd n.r.e.)). Here, the record shows that in his amended answer, McMillan asserted a right of "set-off or credit in the total sum of $155,118.64 against any potential damages that may be awarded." McMillan's request for an offset or credit was based on the payments made by the Plan for medical treatment, physical therapy, and lost wages, along with $250.00 that had been paid by McMillan for the deductible. Thus, McMillan properly pleaded his entitlement to receive an offset in the judgment for those particular amounts paid by the Plan. *See Tarrant Cty. Waste Disposal, Inc. v. Doss*, 737 S.W.2d 607, 611 (Tex. App.—Fort Worth 1987, writ denied).

However, Hearne further argues that even though McMillan may have pled his offset defense, he waived that defense by failing to submit the question to the jury. Hearne cites to *Haygood v. DeEscabedo* in support of his position. *Haygood v. DeEscabedo*, 356 S.W.3d 390

17

(Tex. 2011). Hearne asserts that in *Haygood*, the Texas Supreme Court "addressed the issue of whether the trial judge in a jury trial had the authority to consider post-verdict disputed issues of fact concerning damages." According to Hearne, the court found the trial court had no discretion to consider damages post-verdict. *Id.* Hearne, however, confuses the substantive issues in *Haygood* and misapplies the case here.

In *Haygood*, the plaintiff sought, and the jury awarded, damages for medical expenses that were based on the full bill that the plaintiff had received from the medical providers. *Id*. at 392–93. The bill reflected the "list" price that the medical providers would ideally charge, rather than the adjusted price that had been agreed to by the medical providers and the insurance company. *Id*. The jury awarded damages based on the "list" price, despite the fact that the medical providers had adjusted their bills based on their relationship with Medicare. That adjustment resulted in substantially lower costs than what the medical providers had represented in their billing. *Id.* In its opinion, the Texas Supreme Court interpreted the "actually paid and incurred" language of Section 41.0105 of the Texas Civil Practice and Remedies Code to mean "expenses that have been or will be paid, and exclud[ing] the difference between such amount and charges the service provider bills but has no right to be paid."[9] *Id.* at 396–97. Accordingly, Section 41.0105 limited a plaintiff's recovery of medical expenses to those "which have been or must be paid by or for the claimant." *Id*. at 398.

---

[9]Section 41.0105 states, "In addition to any other limitation under the law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 41.0105.

Although the majority disagreed with the dissent's suggestion that reductions in payments made to providers from the amounts charged should be submitted to the trial court post-verdict, the thrust of the case very clearly centered on the court's holding that a plaintiff could not recover medical expenses that neither the plaintiff nor the insurance company actually paid and that he could not present such evidence to the jury because it would be irrelevant. *Id*. at 399. Likewise, the court found that it would be improper for the trial court to determine the amount of the medical bills "actually paid and incurred" after the jury returned its verdict. *Id*. The court stated, "Accordingly, we hold that only evidence of recoverable medical expenses is admissible at trial. We disapprove the cases that have reached conflicting decisions." *Id*. The court continued, "Nor should the jury be told that a health care provider adjusted its charges because of insurance." *Id.* at 400.

Thus, *Haygood* offers no support for Hearne's position that the trial court lacked discretion in determining an offset of past damages, nor does it support his assertion that McMillan waived his right to an offset by failing to present the issue to the jury.[10] To the contrary, at trial, the issues of causation and damages were properly tried to the jury, with the jury awarding Hearne $162,818.38 in past damages. Hearne did not dispute that McMillan was seeking an offset in the amount of $91,911.02; he merely claimed that McMillan was not legally entitled to that offset.

---

[10]We further note that the Legislative intent behind the statute at issue in *Haygood*—Section 41.0105 of the Texas Civil Practice and Remedies Code—is not the same as the Legislative intent behind Section 406.033 of the Texas Labor Code. *Compare Haygood*, 356 S.W.3d at 391 ("Section 41.0105 of the Texas Civil Practice and Remedies Code [was] enacted in 2003 as part of a wide-ranging package of tort-reform measures."), *with Kroger*, 23 S.W.3d at 349 ("[W]e should liberally construe the Workers' Compensation Act in favor of the injured worker."). In addition, in *Haygood*, the plaintiff attempted to recover more than the amount of expenses the medical provider actually received, whereas in this case, Hearne only received the medical expenses that the parties agreed McMillan actually paid. Thus, *Haygood* is inapposite to the present case.

19

Thus, in this case, there was no factual issue regarding past damages left for the jury's consideration, only the legal issue of McMillan's equitable right of offset, which was rightly left to the trial court for its post-verdict determination. *See Imperial Lofts, Ltd. v. Imperial Woodworks, Inc.*, 245 S.W.3d 1, 5 (Tex. App.—Waco 2007, pet. denied); *see also Doss*, 737 S.W.2d at 611. Accordingly, we find that the trial court was within its discretion in making a post-verdict determination of offset, and McMillan did not waive the issue on appeal.

Hearne's first cross-point of error is overruled.

### C.      Hearne's Second Cross-Point of Error

Next, Hearne contends that because the Plan paid for Hearne's past medical expenses and lost wages, the collateral source rule prevented the award of an offset of damages.[11] "The theory behind the collateral source rule is that a wrongdoer should not have the benefit of insurance independently procured by the injured party, and to which the wrongdoer was not privy."[12] *Brown*, 601 S.W.2d at 934. In *Taylor v. American Fabritech, Inc.*, the Houston Court of Appeals explained:

> The collateral source rule is both a rule of evidence and damages. Generally, it precludes a tortfeasor from obtaining the benefit of, or even mentioning, payments to the injured party from sources other than the tortfeasor. In other words, the defendant is not entitled to present evidence of, or obtain an offset for, funds received by the plaintiff from a collateral source. When the defendant tortfeasor is

---

[11]In this case, McMillan's employee benefit plan was funded by McMillan. We do not address whether an employer who does not fund the employee benefit plan has a right of offset in a nonsubscriber case.

[12]In *Brown*, the Texas Supreme Court applied the collateral source rule and held inadmissible evidence of insurance payments made to the plaintiff pursuant to a policy which he had obtained at his own option, and for which the plaintiff had paid. *Brown*, 601 S.W.2d at 936. The court held that the insurance payments were the result of a contract with which the defendant had no privity and to which it had made no contribution toward its payment. *Id.* at 934–35 (citing *Tex. & Pac. Ry. Co. v. Levi & Bro.*, 59 Tex. 674 (1883)). It would be unfair to a plaintiff, after purchasing insurance for himself, to see the benefits of his own coverage reduce a defendant's accountability for his negligent actions. Notably, those are not the circumstances in this case.

the employer of the injured plaintiff, payments made under an employee benefit plan create a particular puzzle. Basically, if the benefit plan is a fringe benefit for the employee, it is considered a collateral source in regard to the employer, but if the benefit was purchased for the primary purpose of protecting the employer, then the plan is not a collateral source as against the employer. The reasoning is simple: if the plan was purchased for the benefit of the employer[,] then it should be entitled to an offset for payments from the plan to the injured employee.

*Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 626 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (citations omitted).

The appellate court in *Taylor* explained that the employee benefit plan was primarily intended to protect the employer, stating, "[W]e begin by noting the defendants were not subscribers to the Texas Workers' Compensation Fund, and this is one indication that the benefit plan was for the protection of the employer." *Id.* (citing *Doss*, 737 S.W.2d at 611–12). The court continued, "[T]he policy explicitly covered on[-]the[-]job injuries and was not a general insurance policy for the benefit of the employee." *Id.* at 627 (finding that payments made by employer's insurance carrier pursuant to its accident policy covering occupational injuries did not constitute a collateral source and that nonsubscriber was entitled to offset).

In *Rentech Steel, L.L.C. v. Teel*, an employee of Rentech brought suit against the company for serious injuries he sustained to his hand while cleaning a power roller machine. *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 159 (Tex. App.—Eastland 2009, pet. dism'd). The employee alleged negligence and gross negligence. *Id.* The jury returned an award in favor of the employee. Rentech appealed. Among other issues, Rentech maintained that the trial court erred in disregarding its legal entitlement to a credit for its payment of past medical expenses, which, as is the case here, were made pursuant to an employee benefit plan. *Id.* at 162. The employee argued

that Rentech was not entitled to such credit because the payments were made by an insurance company and were subject to the collateral source rule. *Id.*

After explaining the purpose of the collateral source rule, the Eastland Court of Appeals stated, "However, when the wrongdoer 'has provided for those damages, either by personal payment or insurance payment, the damage claim has been satisfied'; to permit the injured party in such circumstances to keep the insurance money and also collect from the wrongdoer 'would be a double recovery not sanctioned by law.'" *Id.* The appellate court went on to explain that payments made pursuant to an employee benefit plan are subject to the collateral source rule only if the plan constitutes a fringe benefit for the employee. *Id.* However, "if the primary purpose of the benefit plan is to protect the employer, then the plan is not a collateral source as against the employer." *Id.* (citing *Johnson v. Dallas Cty.*, 195 S.W.3d 853, 855 (Tex. App.—Dallas 2006, no pet.); *Fabritech*, 132 S.W.3d at 626; *Castillo v. Am. Garment Finishers Corp.*, 965 S.W.2d 646, 650 (Tex. App.—El Paso 1998, no pet.); *Doss*, 737 S.W.2d at 611). Finding that the occupational benefit plan was purchased primarily for the benefit of Rentech, and not for providing a fringe benefit to the employee, the court held that the collateral source rule did not apply and that the trial court erred in denying Rentech's request for an offset. *Id.*

In this case, the Plan stated that it was established to provide benefits for covered employees. "The purpose of the Plan is to provide (i) certain medical benefits for Covered Employees who sustain an occupational injury; (ii) certain wage replacement benefits to Covered Employees who sustain an occupational injury; and (iii) [i]n some cases, certain death or dismemberment benefits." In addition, Section six of the Plan, entitled "Exclusions," stated, "No

22

benefits shall be payable under the Plan for any of the following: (a) Losses or expenses that result from an activity *outside* the Covered Employee's Scope of Employment." (Emphasis added).

The Plan also contained a paragraph, entitled "NO COLLATERAL SOURCE," which stated,

> Benefit payments made under this Plan shall be considered to be made by the Employer of a Covered Employee and shall not be considered payment from a collateral source as that term is defined by rules, statutes, judicial decisions or directives. All payments under this Plan shall be offset against any judgment against the Company, its officers, directors, or agents which may be taken by a Covered Employee or Covered Employee's beneficiaries, heirs, or assigns, resulting from an occupational injury or Death.

As was the case in *Taylor*, McMillan was not a worker's compensation subscriber, "and this is one indication the benefit plan was for the protection of the employer." *See Taylor*, 321 S.W.3d 613.

Although there was little, if any, testimony as to its purpose, the Plan's language clearly stated that coverage was solely available for occupational injuries and wage replacement in the event an employee suffered an injury on the job. It did not, however, cover such things as medical expenses incurred by Hearne in the event of an illness[13] or any activity outside his scope of his employment. Although the Plan clearly provided some benefits to Hearne, we find that the *primary* purpose of the Plan was to protect McMillan. Consequently, the collateral source rule is

---

[13]In addition to twenty-four other exclusions, the Plan specifically excludes "[a]ny losses or expenses incurred from sickness, disease, bodily or mental infirmity, bacterial or viral infection or medical or surgical treatment thereof."

23

inapplicable, and McMillan was entitled to a post-verdict offset of the jury's award of past damages.[14]

Hearne's second cross-point of error is overruled.

**D.      McMillan's Third Point of Error and Hearne's Third Cross-Point of Error**

Having found that McMillan did not waive the offset issue and that the payments made by the Plan did not constitute a collateral source payment, the question remains:  What amount, if any, was McMillan entitled to receive as an offset?

In his offer of proof, made outside of the jury's presence, McMillan presented the testimony of Matt Reiter, a claims manager for Caprock Claims.[15]  Reiter testified that the Plan

---

[14]We agree with our sister courts in *Taylor* and *Teel* that the collateral source rule does not apply in this instance. Typically, the collateral source rule applies when the defendant tortfeasor attempts to offset his liability to the plaintiff on the basis that the plaintiff already received compensation from his own insurance carrier.  Because the plaintiff purchased the health insurance for his own benefit rather than for the tortfeasor's benefit, the plaintiff's health insurance is considered a collateral source.  By contrast, in a nonsubscriber case, the *defendant tortfeasor* pays the plaintiff's medical bills (by setting up an employee benefit plan), not the plaintiff's insurer.  Therefore, payment of benefits by or on behalf of a nonsubscribing employer are not a collateral source, but instead, are essentially advance payments by the nonsubscribing employer on the amount of common law damages it will ultimately owe to the employee.  Thus, payments from an employee benefit plan in nonsubscriber cases are not subject to the collateral source rule.

Of course, it is true—as Hearne points out—that workers' compensation benefits are a collateral source. Hearne further argues that there is no reasonable distinction between workers' compensation benefits and benefits paid by an employee benefit plan in nonsubscriber cases.  Yet, in workers' compensation cases, employees only receive— and employers only pay—statutory benefits; thus, an employee in a workers' compensation case cannot recover common law damages in addition to the statutory benefits. *See Kroger*, 23 S.W.3d at 349–50 ("In exchange [for employees recovering without proving fault] employees receive[] a lower, but more certain, recovery than would have been possible under the common law.").  Accordingly, in a workers' compensation case, there is nothing to offset the workers' compensation benefits against, and there is no risk that an injured employee will obtain a double recovery. By contrast, in nonsubscriber cases, employees can recover common law damages which could substantially exceed the amount of benefits paid by an employee benefit plan.  If an injured employee could recover medical expense benefits from his employee benefit plan and then recover common law damages for his medical expenses from his employer, the employee would receive a double recovery.  Thus, the reasons for applying the collateral source rule to workers' compensation benefits are not applicable in nonsubscriber cases.

In addition, if nonsubscribing employers were unable to offset benefits paid under an employee benefit plan against the common law damages they are required to pay to an injured employee, there would be no incentive for nonsubscribing employers to create employee benefit plans.  Of course, it could be argued that such is the price an employer pays for being a nonsubscriber.  But that scenario potentially harms employees more than employers. Namely, if a nonsubscribing employer does not have sufficient non-exempt assets to pay an injured employee's

paid $155,118.64 for Hearne's medical expenses, along with payments made to Anthony Sign Company in order to reimburse Hearne for his lost wages in the amount of $3,842.64. The evidence also shows that a portion of that sum included a $250.00 deductible paid by McMillan and additional payments made to Medical Pricing Strategies, LLC (MPS), in the amount of $89,596.76. Reiter explained that pursuant to a contract between MPS and Caprock, MPS would negotiate with Hearne's medical providers in order to reduce the amount the medical provider would accept in satisfaction for the full amount owed. In exchange for its services, MPS charged a fee to Caprock in the form of a percentage of the amount of the savings it had obtained. Based on the total amount of payments made by the Plan, McMillan contends, in his third point of error, that he was entitled to a $155,118.64 offset in past damages, which would include the payments made to MPS in the amount of $89,596.76. We disagree and find that McMillan is not entitled to an offset for the fees paid to MPS by the Plan.

Under Section 4.1 of the Plan, entitled "Eligibility for Benefits," it states, "A Covered Employee shall *only be eligible for payment of benefits as described below*, if the Covered Employee sustains an injury." (Emphasis added). The Plan specifically includes medical expense benefits, weekly accident disability benefits, death benefits, and dismemberment benefits.

---

common law damages, then an employee who obtains a judgment against that insolvent nonsubscribing employer would recover nothing. At least with an employee benefit plan, the employee's recovery of a portion of his damages is guaranteed without sacrificing the right to recover all of his common law damages. If an employer has no right to offset, then an employee with an employee benefit plan would essentially be paying the damages to the employee twice. This would substantially discourage a nonsubscribing employer from adopting an employee benefit plan. Consequently, were we to interpret Section 406.033 as prohibiting nonsubscribing employers from offsetting benefits paid under an employee benefit plan, we would be giving an interpretation contrary to the interests of the injured employee.

[15]Caprock Claims is the third-party administration company that issued the policy on behalf of Life Insurance Company of North America.

The Plan does not, however, contain a provision stating that the Plan would pay the costs of a third party's services for negotiating a reduction in an employee's medical costs. Thus, the section of the Plan relating to any potential offset, which states, "*All payments under this Plan shall be offset against any judgment,*" is inapplicable to services such as those provided by MPS.[16] (Emphasis added).

In his third cross-point of error, Hearne contends that in the event we find an offset of damages is appropriate, it should be in the amount of $65,521.88. We agree. The uncontroverted evidence showed that the Plan paid $65,271.88 of Hearne's medical expenses and past wages and that McMillan paid a $250.00 deductible. As a result of those payments, McMillan was entitled to a $65,521.88 offset in the jury's past damages award of $162,818.38, resulting in a judgment in favor of Hearne for past damages in the amount of $97,296.50.

For these reasons, we overrule McMillan's third point of error and sustain Hearne's third cross-point of error.

---

[16]Moreover, the payments to MPS were not made for Hearne's benefit, but for McMillan's. As a nonsubscriber, McMillan was liable to Hearne for 100% of Hearne's work-related medical expenses regardless of amount. Therefore, payments made to MPS to negotiate a reduction in Hearne's medical expenses only benefitted McMillan. Thus, the amounts paid to MPS were not benefits paid to Hearne.

Furthermore, in a nonsubscriber case, an employee is entitled to recover common law damages, and the amount of the employee's economic damages (including reasonable and necessary medical expenses) is commonly a factor in a jury's evaluation of the employee's noneconomic damages (pain and suffering, disfigurement, etc.). *See Haygood*, 356 S.W.3d at 405 (Lehrmann, J., dissenting) (noting that "the extent of the plaintiff's medical charges may affect the jury's calculation of non-economic damages"). If a nonsubscribing employer could limit the employee's overall recovery by reducing the amount of medical expenses admissible before the jury but then obtain an offset for the amounts it paid a third party to negotiate those reductions, it would receive a double-offset. This might be consistent with the legislative intent behind tort-reform statutes. *See supra* note 11. But allowing nonsubscribing employers to mitigate an employee's damages by reducing the amount of medical bills submitted to the jury but then receive an offset for the expenses incurred in reducing those expenses would be inconsistent with the requirement that we interpret Section 406.033 "in favor of the injured worker." *Kroger*, 23 S.W.3d at 349. It would also "suppl[y] by implication restrictions on an employee's rights that are not found in section 406.033's plain language." *Id.*

26

### III.    Conclusion

Accordingly, we modify the trial court's judgment to reflect an award of past damages in the amount of $97,296.50.  As modified, we affirm the judgment of the trial court.

Ralph K. Burgess
Justice

Date Submitted:     May 8, 2019
Date Decided:      July 22, 2019